In the

# UNITED STATES COURT OF APPEALS

for the Seventh Circuit

## No. 26-2885

AUNG DOE, *et al.*,
on their own behalf and on behalf of others similarly situated,

Plaintiffs-Appellees,

v.

MARKWAYNE MULLIN, Secretary of Homeland Security, *et al.*,

Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 25 C 15483, Matthew F. Kennelly, *Judge*.

# BRIEF OF THE APPELLANTS AND SHORT APPENDIX


ANDREW S. BOUTROS
United States Attorney
for the Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

THOMAS P. WALSH
Assistant United States Attorney
Civil Division Chief

JOSHUA S. PRESS
Assistant United States Attorney
(312) 886-7625

**Table of Contents** **Page**


Jurisdictional Statement ........ 1

Issues Presented for Review ........ 2

Statement of the Case ........ 3

I. Statutory Background ........ 3

II. Prior Proceedings and the Court's Decision in *Mullin v. Doe* ........ 5

III. District Court Proceedings ........ 7

Summary of the Argument ........ 10

Argument ........ 14

I. Standards of Review ........ 14

II. Section 1254a(b)(5)(A) Bars Judicial Review of the Plaintiffs' Equal Protection Claim. ........ 14

III. Rational-Basis Review Governs Plaintiffs' Equal Protection Challenge, and the TPS Termination Here Easily Satisfies It. ........ 22

IV. Even Under *Arlington Heights*, the Complaint Does Not State a Plausible Claim After *Mullin v. Doe* ........ 28

V. The District Court Correctly Dismissed the Plaintiffs' Remaining Claims. ........ 37

VI. The Plaintiffs Should Not Be Permitted to Proceed Under Pseudonyms. ........ 42

Conclusion ........ 47

Certificate of Compliance with Rule 32(a)

Certificate of Service

Certificate of Compliance with Rule 30(d)

## Table of Authorities

**Case** **Page(s)**


*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ *passim*

*Bd. of Regents v. Roth*,
408 U.S. 564 (1972) ........ 41

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 31, 33

*Bi-Metallic Investment Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) ........ 41

*Biden v. Texas*,
597 U.S. 785–801 (2022) ........ 21

*Brockett v. Effingham County*,
116 F.4th 680 (7th Cir. 2024) ........ 14

*Cheney v. U.S. Dist. Ct.*,
542 U.S. 367 (2004) ........ 34

*City of Chicago v. Shalala*,
189 F.3d 598 (7th Cir. 1999) ........ 24

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ........ 39

*Czerkies v. U.S. Dep't of Labor*,
73 F.3d 1435 (7th Cir. 1996) (en banc) ........ 40

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ........ 25, 34, 37

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019) ........ 37

*Dhakal v. Sessions*,
895 F.3d 532 (7th Cir. 2018) ........ 14

*Doe v. Mullin*, No. 26-1294,
2026 WL 2093686 (7th Cir. July 16, 2026) ........................................................ 2, 7

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005) ......................................................................... 46

*Doe v. Trustees of Ind. Univ.*,
101 F.4th 485 (7th Cir. 2024) .................................................................. *passim*

*Doe v. Univ. of S. Ind.*,
172 F.4th 511 (7th Cir. 2026) ................................................................ 43, 46

*Doe v. Village of Deerfield*,
819 F.3d 372 (7th Cir. 2016) ......................................................................... 43

*Doe v. Young*, No. 24-2871,
2025 WL 927320 (7th Cir. Mar. 27, 2025) .................................................... 44, 45

*FCC v. Beach Communications, Inc.*,
508 U.S. 307 (1993) ............................................................................... 11, 26

*Fiallo v. Bell*,
430 U.S. 787 (1977) ............................................................................... 24, 26

*Goros v. County of Cook*,
489 F.3d 857 (7th Cir. 2007) ......................................................................... 41

*Greenlaw v. United States*,
554 U.S. 237 (2008) ..................................................................................... 37

*Hawxhurst v. Pettibone Corp.*,
40 F.3d 175 (7th Cir. 1994) ........................................................................... 21

*Holy Virgin Prot. Cathedral of the Russian Orthodox Church v. Chertoff*,
499 F.3d 658 (7th Cir. 2007)......................................................................... 18

*Int'l Refugee Assistance Project v. Trump*,
961 F.3d 635 (4th Cir. 2020) ............................................................ 12, 23, 27, 32

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .................................................................................. 19, 20

*Ky. Dep't of Corrections v. Thompson*,
490 U.S. 454 (1989) ..................................................................................... 40

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .......... 22

*Mathews v. Diaz*,
426 U.S. 67 (1976) .......... 11, 24

*Mathews v. Eldridge*,
424 U.S. 319 (1976) .......... 40

*McCready v. White*,
417 F.3d 700 (7th Cir. 2005) .......... 15

*Mullin v. Al Otro Lado*,
609 U.S. 258 (2026) .......... 21

*Mullin v. Doe*,
609 U.S. 324 (2026) .......... *passim*

*Nat'l Rifle Ass'n of Am. v. Vullo*,
602 U.S. 175 (2024) .......... 28

*Nielsen v. Preap*,
586 U.S. 392 (2019) .......... 4, 38

*Nobles v. Mullin*,
177 F.4th 886 (7th Cir. 2026) .......... 10, 16, 17

*Patel v. Garland*,
596 U.S. 328 (2022) .......... 15

*Portillo-Rendon v. Holder*,
662 F.3d 815 (7th Cir. 2011) .......... 39

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) .......... 44, 45

*Roe v. Dettelbach*,
59 F.4th 255 (7th Cir. 2023) .......... 43, 44

*Romer v. Evans*,
517 U.S. 620 (1996) .......... 13, 41

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) .......... 23

*Sheldon v. Sill*,
49 U.S. (8 How.) 441 (1850) .................................................................................. 20

*Shiba v. Mullin*,
173 F.4th 895 (7th Cir. 2026) ............................................................................. 24

*Soni v. Jaddou*,
103 F.4th 1271 (7th Cir. 2024) ........................................................................... 19

*Staub v. Proctor Hospital*,
562 U.S. 411 (2011) ...................................................................................... 34, 35

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................................ 15, 21

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) .............................................................................................. 40

*Trump v. Hawaii*,
585 U.S. 667 (2018) ...................................................................................... *passim*

*United States v. Hudson*,
11 U.S. (7 Cranch) 32 (1812) ................................................................................. 20

*Village of Arlington Heights v. Metro. Housing Development Corp.*
429 U.S. 252 (1977) ........................................................................... 3, 22, 32, 36

*Webster v. Doe*,
486 U.S. 592 (1988) ................................................................................. 11, 18, 19

*Weinberger v. Salfi*,
422 U.S. 749 (1975) .............................................................................................. 20

*Wong Wing v. United States*,
163 U.S. 228 (1896) .............................................................................................. 26

*Yamaha Motor Corp., U.S.A. v. Calhoun*,
516 U.S. 199 (1996) .................................................................................. 2, 14, 37

**Statute**

5 U.S.C. § 701 ............................................................................................................ 1

5 U.S.C. § 705 ............................................................................................... 1, 5, 7, 21

6 U.S.C. § 557 .......... 4, 38

8 U.S.C. § 1103 .......... 4, 38

8 U.S.C. § 1252 .......... 16, 17, 18, 21

8 U.S.C. § 1254a .......... *passim*

28 U.S.C. § 1292 .......... 1, 2, 9, 14, 27

28 U.S.C. § 1331 .......... 1

## Jurisdictional Statement

The plaintiffs are six Burmese nationals who held Temporary Protected Status ("TPS") under Burma's designation, suing on their own behalf and on behalf of a putative class. R. 90 ("Am. Compl.") ¶¶ 1, 202, Supplemental Appendix ("Supp. App'x") at 27–108.[1] The plaintiffs brought an Administrative Procedure Act case under 5 U.S.C. § 701, claiming that the district court had jurisdiction under 28 U.S.C. § 1331. *Id.* at ¶ 19. Their amended complaint, filed July 14, 2026, asserted five claims challenging the Secretary of Homeland Security's termination of Burma's TPS designation: two under the Administrative Procedure Act, one alleging that the termination was ultra vires, one alleging a procedural due process violation, and one equal protection claim resting on two theories—race discrimination and "bare animus" toward TPS holders. *Id.* at ¶¶ 207–31. Defendants maintain that plaintiffs' action is barred by 8 U.S.C. § 1254a(b)(5)(A).

On August 7, 2026, the district court entered a memorandum opinion and order denying the plaintiffs' renewed motion to postpone the termination under 5 U.S.C. § 705; dismissing the APA, ultra vires, due process, and bare-animus claims; and denying defendants' motion to dismiss the race-discrimination equal protection claim. R. 115, Short Appendix ("S. App'x") at 1–26. In that same order, however, the district court certified its denial of the motion to dismiss for interlocutory appeal under 28 U.S.C. § 1292(b), holding that the ruling involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate

[1] "R. __" refers to numbered items on the district court's docket.

appeal may materially advance the ultimate termination of the litigation. S. App'x 25–26.

Within 10 days of the entry of the district court's certified order, defendants petitioned this court for permission to appeal on August 17, 2026. 28 U.S.C. § 1292(b); Fed. R. App. P. 5(a)(2). This court granted that petition on September 15, 2026. *Mullin v. Doe*, No. 26-8018, Dkt. 7 (7th Cir. Sept. 15, 2026). The order granting permission serves as the notice of appeal under Federal Rule of Appellate Procedure 5(d)(2). This court has jurisdiction under 28 U.S.C. § 1292(b). Because appellate jurisdiction under § 1292(b) attaches to the certified order rather than to the particular question the district court formulated, this court may address any issue fairly included within that order. *See, e.g.*, *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

This case was previously before this court earlier this year, when it summarily reversed the district court's January 2026 order postponing the effective date of the Secretary's TPS termination for Burma. *Doe v. Mullin*, No. 26-1294, 2026 WL 2093686 (7th Cir. July 16, 2026).

## Issues Presented for Review

1. Whether 8 U.S.C. § 1254a(b)(5)(A), which provides that "[t]here is no judicial review of any determination" of the Secretary of Homeland Security with respect to the termination of a foreign state's TPS designation, bars the plaintiffs' equal protection challenge to the Secretary's termination of Burma's designation.

2. Whether rational-basis review, rather than the framework of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), governs an equal protection challenge to the Secretary's decision to terminate a foreign state's TPS designation. And if so, whether, under that standard, the plaintiffs' race-discrimination claim fails as a matter of law.

3. Whether, even under *Arlington Heights*, the plaintiffs' race-discrimination claim fails to state a plausible claim for relief, where it rests on the same categories of statements and the same termination pattern that the Supreme Court, in *Mullin v. Doe*, 609 U.S. 324 (2026), held were insufficient to show that a TPS termination was based on race, and where the Supreme Court identified a "strong, race-neutral explanation" for that evidence.

4. Whether the district court correctly dismissed the plaintiffs' remaining claims.

5. Whether the plaintiffs should be permitted to proceed under pseudonyms.

## Statement of the Case

## I. Statutory Background

### A. Temporary Protected Status

The TPS statute authorizes the Secretary of Homeland Security to designate a foreign state for TPS upon finding that one of three conditions exists, including, as relevant here, that "there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily

in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). Designations run for 6 to 18 months. *Id.* § 1254a(b)(2)(B). At least 60 days before a designation expires, the Secretary, "after consultation with appropriate agencies," must "review the conditions in the foreign state" and "determine whether the conditions for such designation under this subsection continue to be met." *Id.* § 1254a(b)(3)(A). If they do not, the Secretary "shall terminate the designation" by publishing notice in the Federal Register. *Id.* § 1254a(b)(3)(B). Congress further provided that "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A).[2]

Nationals of a designated state who are present in the United States and meet the statutory eligibility criteria may register for TPS, which confers protection from removal and work authorization for the duration of the designation. *Id.* § 1254a(a)(1), (c). The Supreme Court has recently summarized the statute's structure and history. *Mullin v. Doe*, 609 U.S. 324, 329–34 (2026).

**B. The Designation and Termination of TPS for Burma**

The Secretary designated Burma for TPS in 2021 on the basis of extraordinary and temporary conditions following the February 2021 military coup. 86 Fed. Reg.

---

[2] Although the Immigration and Nationality Act still refers to the Attorney General, the Homeland Security Act of 2002 transferred the relevant functions to the Secretary of Homeland Security, 6 U.S.C. § 557; 8 U.S.C. § 1103(a)(1), as the district court held, S. App'x 14–19, and as the Supreme Court has recognized, *see Nielsen v. Preap*, 586 U.S. 392, 398 n.2 (2019); *see also Mullin v. Doe*, 609 U.S. at 338.

28,132 (May 25, 2021); Am. Compl. ¶ 44. The designation was extended and redesignated in 2022 and 2024. Am. Compl. ¶¶ 45–50. On November 25, 2025, following the statutory review, the Secretary terminated Burma's designation effective January 26, 2026. 90 Fed. Reg. 53,378 (Nov. 25, 2025). The notice recited consultation with appropriate agencies; cited improvements in Burma's governance and stability at the national and local levels, including the end of the state of emergency and planned elections; and determined that, while some extraordinary and temporary conditions might persist, permitting Burmese nationals to remain temporarily in the United States was contrary to the national interest for reasons of national security, public safety, foreign policy, and immigration integrity. *Id.* at 53,379–82. Approximately 3,969 Burmese nationals held TPS under the designation, with 236 applications pending. *Id.* at 53,381.

## II. Prior Proceedings and the Court's Decision in *Mullin v. Doe*

The plaintiffs filed this putative class action in December 2025, asserting two APA claims and one equal protection claim. R. 1. On January 23, 2026, the district court postponed the termination's effective date under 5 U.S.C. § 705, resting exclusively on the APA claims and declining to reach the constitutional claim. R. 51, 52. The defendants appealed. R. 56.

While that appeal was pending, the Supreme Court decided *Mullin v. Doe*, 609 U.S. 324 (2026), which reversed postponement orders entered by the Southern District of New York and the District of Columbia in challenges to the terminations of Syria's and Haiti's TPS designations, respectively. The Court held that the TPS

statute's judicial-review bar "applies to all non-constitutional claims," *id.* at 345, rejecting the argument that challenges to the Secretary's alleged procedural errors (including the alleged failure to consult appropriate agencies) escape the bar, and emphasizing that "challengers cannot avoid a judicial-review bar by creative pleading or clever lawyering," *id.* at 344.

Turning to the Haiti plaintiffs' equal protection claim (the only constitutional claim before it), the Court examined the statements by the President and the Secretary on which the claim rested, together with the administration's termination of the TPS designations of "every country that came up for review, 13 in all," including Burma. *Id.* at 347–49. The Court concluded that "[n]one of the cited statements by either the President or the Secretary was overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications," *id.* at 348; that "whatever one may think of the cited statements, they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people," *id.* at 349; and that the respondents themselves had identified "a strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies," *id.* Viewing all the relevant evidence, the Court concluded that the Haiti plaintiffs were "unlikely to prove that race was a motivating factor" in the termination and therefore were "not entitled to interim relief on their equal protection claim." *Id.* at 350. In a footnote, the Court denied a motion to

dismiss the writ premised on newly discovered evidence, explaining that the evidence was "cumulative of other evidence in the record[.]" *Id.* at 350 n.7.

Three weeks later, this court summarily reversed the district court's postponement order in this case and remanded "for further proceedings in light of and consistent with" *Mullin v. Doe*. *Doe v. Mullin*, 2026 WL 2093686, at *1.

On remand, the plaintiffs amended their complaint, re-pleading their original claims and adding ultra vires, procedural-due-process, and "bare animus" equal protection theories. Am. Compl. ¶¶ 207–31. They renewed their § 705 APA motion on the new ultra vires and due process claims alone. R. 98, 99. The defendants opposed that motion, R. 106, moved to dismiss all five counts, R. 109, 110, and moved to stay discovery, R. 108.

## III. District Court Proceedings

On August 7, 2026, the district court denied the renewed postponement motion and dismissed every claim but one. S. App'x 12–25. It rejected the ultra vires claim on the merits, holding that the Homeland Security Act of 2002 transferred TPS authority to the Secretary, S. App'x 14–19; held that, in light of that conclusion and *Mullin v. Doe*, the APA claims are barred by § 1254a(b)(5)(A), S. App'x 19; dismissed the procedural due process claim because the alleged statutory defects do not amount to a constitutional violation, S. App'x 19–21; and dismissed the bare-animus equal protection theory because "there is a distinction between bare desire to harm TPS holders and animus against TPS policy (and immigration as a whole)" and "[t]he

Supreme Court's reasoning in *Mullin* points to the latter, not the former," S. App'x 25.

The district court declined, however, to dismiss plaintiffs' race-discrimination theory. It observed that the plaintiffs "rely upon much of the same evidence" as the Haiti plaintiffs in *Mullin v. Doe*, and that their theory "is less about discrimination against Burma in particular, and more about racial discrimination as between white and non-white people." S. App'x 23. Assuming, as the Supreme Court had, that *Arlington Heights* supplies the governing framework, the court reasoned that *Mullin v. Doe* "was decided under a likelihood of success standard based on only public statements"; that the Supreme Court "did not decide that the plaintiffs had failed to state a plausible claim for relief"; that *Arlington Heights* calls for a "sensitive inquiry" into circumstantial and direct evidence of intent; and that "it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*." S. App'x 23–24.

The district court acknowledged the contrary reading. "On the other hand," it wrote, "the Supreme Court's reasoning in *Mullin* suggests that it might not be so limited by its procedural posture." S. App'x 24. Because *Mullin v. Doe* "emphasized that the evidence provided a 'strong, race-neutral explanation' for the TPS terminations and public statements," the court recognized that "[f]ollowing the reasoning in *Mullin*, the same could be said of the allegations here," citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), for the proposition that allegations "merely consistent with" liability "stop[] short of the line between possibility and

plausibility[.]" S. App'x 24 (quotations omitted). The court nonetheless concluded that if *Mullin v. Doe*'s reasoning sufficed to defeat the claim, "it is hard to see what evidence, short of an outright admission that racial animus motivated the decision to terminate TPS, would help the plaintiffs." S. App'x 24–25. It therefore denied the motion to dismiss the race-discrimination claim, and, "because there is substantial ground for difference of opinion on the scope of *Mullin*" and resolution of "this controlling question of law may materially advance the ultimate termination of this litigation," certified its ruling under § 1292(b). S. App'x 25. The court denied the defendants' motion to stay discovery as moot. S. App'x 26.

## IV. Proceedings in This Court

The defendants petitioned for permission to appeal and moved for a stay of district court proceedings. *Mullin v. Doe*, No. 26-8018, Dkt. 1, 2. This court granted that petition on September 15, 2026. *Mullin v. Doe*, No. 26-8018, Dkt. 7. In the same order, this court also granted the plaintiffs' motion to file their disclosure statement under seal, "provisionally" allowed them to proceed under pseudonyms, and directed the parties to "include in any briefs arguments supporting and opposing" the plaintiffs' request to use pseudonyms "so that the merits panel can resolve this question." *Id.* at 2.

On August 17, 2026, the plaintiffs moved the district court for reconsideration of the dismissal of their bare-animus and procedural due process claims. R. 117. That motion attaches the transcript of the district court's hearing on the parties' motions, Supp. App'x at 125–60, and remains pending.

## Summary of the Argument

The Supreme Court examined many of the same statements and the termination pattern on which the plaintiffs' race-discrimination claim rests and concluded that they do not show that a TPS termination was based on race. The district court held that this conclusion does not control at the pleading stage because it was reached in deciding a request for interim relief. That was wrong.

Before reaching that substantive question, though, this court should hold that federal courts lack jurisdiction over the plaintiffs' equal protection claim. The TPS statute provides that there is "no judicial review of any determination" of the Secretary with respect to the termination of a designation. 8 U.S.C. § 1254a(b)(5)(A). The Supreme Court held in *Mullin v. Doe* that this text "is clear, and its plain meaning is very broad," and that it "very clearly overcomes the general presumption in favor of judicial review." 609 U.S. at 339–40. Nothing in that text distinguishes constitutional from statutory claims. Instead, the text bars "judicial review," a term whose core meaning is a court's power to invalidate executive action as unconstitutional. *Id.* at 351–52 (Thomas, J., concurring). Indeed, this court held only months ago that the Immigration and Nationality Act's ("INA") judicial-review bars reach constitutional claims, that the clear-statement standard is satisfied by text that admits no exception for "nonstatutory" law, and that channeling constitutional claims to removal proceedings answers any constitutional-avoidance concern. *Nobles v. Mullin*, 177 F.4th 886 (7th Cir. 2026). Section 1254a(b)(5)(A) is more explicit still, and the plaintiffs—foreign nationals who may raise constitutional claims in any

removal proceeding—are in the same position as the channeled plaintiff in *Nobles*.[3] The clear-statement rule of *Webster v. Doe*, 486 U.S. 592 (1988), is therefore satisfied, and because Congress has plenary authority over the jurisdiction of the inferior federal courts, construing the statute as written raises no constitutional difficulty. The Supreme Court left this question open in *Mullin v. Doe* only because the Haiti plaintiffs lost on the merits; on review of a Rule 12(b)(6) ruling, jurisdiction comes first.

On the merits, the district court erred for three reasons.

*First*, the district court assumed without deciding that *Arlington Heights* supplies the governing framework. It does not. Equal protection challenges to the Executive's immigration-policy judgments (particularly judgments, like this one, that turn on foreign-country conditions and the national interest) receive rational-basis review under *Trump v. Hawaii*, 585 U.S. 667 (2018), and *Mathews v. Diaz*, 426 U.S. 67 (1976), a rule this court has long applied to immigration-related classifications. *Mullin v. Doe* expressly left the question open while holding that, even under *Arlington Heights*, "the immigration context is an important factor" to consider. 609 U.S. at 347. Under rational-basis review, the decisionmaker's actual motivation is irrelevant, *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993), and a termination that applies the statute's own review criteria to a country the Secretary found had improved is plainly related to legitimate ends.

---

[3] This brief uses the term "foreign national" as equivalent to the statutory term of "alien" within the INA.

*Second*, the claim fails even under *Arlington Heights*. A complaint whose allegations are "merely consistent with" liability does not cross "the line between possibility and plausibility," and an "obvious alternative explanation" defeats the inference of unlawful conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 682 (2009). *Mullin v. Doe* supplies that explanation. The opinion of the Court characterized the same categories of statements and the same thirteen-country termination pattern, Burma included, and found in them "a strong, race-neutral explanation." 609 U.S. at 349. Those are conclusions about what the evidence shows, not about how a preliminary record weighs. The district court itself recognized that "the same could be said of the allegations here." S. App'x 24. The Fourth Circuit rejected precisely the posture distinction the district court drew when a district court declined to dismiss constitutional claims after *Hawaii*, holding that the Supreme Court's characterization was a "predicate unconditional conclusion" that was "not stated on a 'likelihood' basis." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 653 (4th Cir. 2020) ("*IRAP*"). And the "predictive—not a final—decision" language on which the plaintiffs rely appears in a part of *Mullin v. Doe* that did not command a majority and concerns the order in which jurisdiction and merits may be addressed, not the force of the Court's assessment of the evidence.

The plaintiffs' own allegations confirm the point. The statements they point to principally concern *other* countries. Their Burma-specific allegation is a remark more than six years before the termination. Am. Compl. ¶ 132. And the district court's remaining rationale—that discovery might reveal what the public record has not—

inverts the pleading standard. Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 556 U.S. at 678–79, and the discovery at issue here would probe the motives of the President and a Cabinet officer in a core area of Executive responsibility.

The district court correctly dismissed the plaintiffs' remaining claims. Although the plaintiffs did not cross-petition and may not ask this court to disturb those rulings, they are part of the certified order, and the plaintiffs have moved the district court to reconsider two of them. R. 117. Each was correctly decided because the Homeland Security Act transferred TPS authority to the Secretary; *Mullin v. Doe* bars plaintiffs' APA claims; the procedural due process claim repackages statutory objections that the Constitution does not impose; and the "bare animus" theory founders on the distinction—drawn by *Romer v. Evans*, 517 U.S. 620, 634–35 (1996), and confirmed by *Mullin v. Doe*—between hostility toward a program at large and a bare desire to harm the specific persons who benefit from it.

*Finally*, the plaintiffs should litigate under their own names. The norm in federal litigation is that all parties' names are public, and this court has repeatedly required adult litigants to justify anonymity with evidence of a substantial risk of physical harm or third-party retaliation "beyond the reaction legitimately attached to the truth of events." *Doe v. Trustees of Ind. Univ.*, 101 F.4th 485, 491 (7th Cir. 2024). The district court permitted pseudonyms on an unopposed motion without any findings. The plaintiffs' principal asserted harm (that litigating by name exposes them to immigration enforcement) is the lawful consequence of their own status in

this country. That is not retaliation, and plaintiffs' generalized fear of a foreign regime, untethered to any showing that this litigation would identify them to it, is the kind of assertion this court has held insufficient.

## Argument

### I. Standards of Review

This court reviews dismissals for lack of jurisdiction *de novo*. *Dhakal v. Sessions*, 895 F.3d 532, 536 (7th Cir. 2018). Similarly, and to the extent this court reviews the district court's dismissal of plaintiffs' fourth claim for failure to state a claim, this court also reviews such dismissals *de novo*. *Brockett v. Effingham County*, 116 F.4th 680, 685 (7th Cir. 2024).

On an appeal under § 1292(b), this court may address any question fairly included in the certified order. *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996).

The propriety of pseudonymous litigation is a question this court examines independently, because the public's interest in open proceedings does not depend on the parties' agreement. *Trustees*, 101 F.4th at 491–92.

### II. Section 1254a(b)(5)(A) Bars Judicial Review of the Plaintiffs' Equal Protection Claim.

The first hurdle for plaintiffs' case is jurisdiction. The district court held that the TPS statute's judicial-review bar does not reach constitutional claims, reasoning that *Mullin v. Doe* had "assumed—based on the government's concession—that constitutional claims would still be reviewable," and that it saw "no reason to depart from that assumption." S. App'x 20. But an assumption is not a holding. *See Mullin*

*v. Doe*, 609 U.S. at 351 (Thomas, J., concurring) ("The Court does not decide whether the [Haitian] respondents' equal protection claim is barred as well."); *id.* at 345 (opinion of Alito, J.) ("[W]e need not resolve whether the TPS statute meets that clear-statement rule[.]"). The question is thus still open, it is jurisdictional, and it should be decided first. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–94 (1998); *McCready v. White*, 417 F.3d 700, 702 (7th Cir. 2005) ("Ensuring the existence of subject-matter jurisdiction is the court's first duty in every lawsuit."). Indeed, the latitude the *Mullin v. Doe* plurality identified to bypass jurisdiction when reviewing interim relief, 609 U.S. at 345–46, has no application to a Rule 12(b)(6) ruling, where the court's decision on the merits is final.

**A. The TPS Statute Bars "Any" Judicial Review.**

As alluded to above, § 1254a(b)(5)(A) provides: "There is *no judicial review of any determination* of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." (Emphasis added.) The Supreme Court has now construed that text. *Mullin v. Doe*, 609 U.S. at 339 ("This text is clear, and its plain meaning is very broad."). The word "any" encompasses determinations of whatever kind. *See Patel v. Garland*, 596 U.S. 328, 338 (2022). And "with respect to" has "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Mullin v. Doe*, 609 U.S. at 339 (quoting *Patel*, 596 U.S. at 339). Therefore, although "executive determinations generally are subject to judicial review," the Court held that "the text of the TPS judicial-review bar very clearly overcomes the general

presumption in favor of judicial review." *Id.* at 340.

Nothing in that text turns on the source of law underlying the claim. The statute does not just bar "review under the Administrative Procedure Act," or "review of statutory claims," but bars all "judicial review." That term's common meaning is "[a] court's power to review the actions of other branches or levels of government," and "esp[ecially]" the "power to invalidate legislative and executive actions as being unconstitutional." *Id.* at 351–52 (Thomas, J., concurring) (quoting *Black's Law Dictionary* 1011 (12th ed. 2024)). The plaintiffs ask this court to do exactly that: to set aside the Secretary's determination to terminate Burma's designation as unconstitutional. Am. Compl. ¶ 223. That is "judicial review of" a "determination . . . with respect to the . . . termination . . . of a designation," and § 1254a(b)(5)(A) forbids just that. A claim that the termination was unlawful because it violated the Fifth Amendment is a "matter[] relating to" the termination in exactly the way a claim that it was unlawful because it violated the APA is. Further, the broadening phrase "with respect to" draws no distinction between them. *See Mullin v. Doe*, 609 U.S. at 339. And where Congress has wished to preserve constitutional claims from an otherwise comprehensive review bar in the immigration laws, it has said so expressly. *See* 8 U.S.C. § 1252(a)(2)(D) (preserving "review of constitutional claims or questions of law"). Section 1254a(b)(5)(A) contains no such carve-out.

### B. This Court Has Already Held That the INA's Judicial-Review Bars Reach Constitutional Claims.

This court addressed the reach of the INA's jurisdiction-stripping provisions over constitutional claims earlier this year. In *Nobles v. Mullin*, 177 F.4th 886 (7th

Cir. 2026), the plaintiffs challenged the denial of an immigrant-visa petition under the Adam Walsh Act, which commits the relevant determination to the Secretary's "sole and unreviewable discretion," and pleaded nine constitutional claims alongside their statutory ones. *Id.* at 889–91. This court began from the premise that "[a]s a court of limited (not general) jurisdiction, our 'fair presumption is . . . that a cause is without [our] jurisdiction, until the contrary appears,'" *id.* at 892 (quoting *Turner v. Bank of N. Am.*, 4 U.S. (4 Dall.) 8, 10 (1799)), and that "the APA's presumption favoring judicial review does not trump the INA's jurisdiction-stripping framework," *id.* at 894 (citing *Britkovyy v. Mayorkas*, 60 F.4th 1024, 1027, 1030 (7th Cir. 2023)).

Turning to the constitutional claims, *Nobles* acknowledged the "well-established principle" that a statute will not be read to foreclose jurisdiction over constitutional challenges "unless Congress' intent to do so is manifested by clear and convincing evidence." *Id.* at 898 (quoting *Califano v. Sanders*, 430 U.S. 99, 109 (1977)). Still, *Nobles* held that that standard was met there because § 1252(a)(2)(B) applies "[n]otwithstanding any other provision of law (statutory or nonstatutory)," "'nonstatutory' federal law includes constitutional provisions" (meaning that the bar reaches constitutional claims), and § 1252(a)(2)(D) preserves them only in a petition for review of a removal order. *Id.* at 897. This court therefore held that it lacked jurisdiction over the foreign-national plaintiff's constitutional claims because they were channeled to removal proceedings, and that it lacked jurisdiction over the citizen plaintiff's claims (which were "not channeled anywhere" but "simply barred") because none was "egregious" or even "colorable." *Id.* at 899–900 (following *Holy Virgin*

*Protection Cathedral of the Russian Orthodox Church Outside Russia v. Chertoff*, 499 F.3d 658, 662–63 (7th Cir. 2007)).

Each step of that analysis applies here. Section 1254a(b)(5)(A) is more explicit than the provision in *Nobles* because it does not just withdraw jurisdiction over discretionary "decision[s] or action[s]" but forbids "judicial review" of "any determination" outright, and the Supreme Court has already held that this language "very clearly overcomes" the typical presumption of reviewability. *Mullin v. Doe*, 609 U.S. at 340. If the "clear and convincing evidence" standard was satisfied in *Nobles* by the phrase "statutory or nonstatutory," it is satisfied here by a judicial-review bar that explicitly covers "any determination."

And the constitutional-avoidance concern that underlies *Webster v. Doe*, 486 U.S. 592 (1988), and *Califano* (*i.e.*, that no forum will exist for a constitutional claim) is answered as it was in *Nobles*. The plaintiffs here are foreign nationals who, to the extent reviewable, may raise any constitutional challenge to the TPS termination for Burma in a petition for review of a final order of removal. 8 U.S.C. § 1252(a)(2)(D). *Nobles* held that the availability of that forum defeats the argument that constitutional claims must be heard in the district court. 177 F.4th at 899; *see also Holy Virgin*, 499 F.3d at 662. And to the extent *Holy Virgin* reserves the possibility of district court jurisdiction over "egregious" constitutional violations, *id.* at 663, that reservation is not implicated where, as here, the Supreme Court has already examined the plaintiffs' evidence and concluded that it does not show racial purpose. *See* 609 U.S. at 347–50. That means there is nothing egregious here to justify district

court jurisdiction. *Nobles*, 177 F.4th at 899–900. Indeed, *Nobles* dismissed for want of jurisdiction an equal protection theory premised on alleged animus pleaded through "naked assertion[s]" without "further factual enhancement." *Id.* at 900 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). So too here.

**C. *Webster*'s Clear-Statement Rule Is Satisfied Here.**

Naturally, plaintiffs will invoke *Webster*'s rule that "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." 486 U.S. at 603. That rule is a species of constitutional avoidance, and it applies only where the statute is actually ambiguous. *Mullin v. Doe*, 609 U.S. at 352 (Thomas, J., concurring). The statute in *Webster* was ambiguous because it committed termination decisions to the CIA Director's discretion and said nothing about judicial review. *See* 486 U.S. at 594, 603–04. But § 1254a(b)(5)(A) is crystal clear on this point because it speaks directly to judicial review, forbids it as to "any determination," and—as the Supreme Court has already held—does so in terms that "very clearly" overcome the presumption of reviewability. 609 U.S. at 340.

Put another way, "[t]here is no indication in the text that reviewability may turn on the source of law for the underlying claim. It follows that constitutional avoidance has no role." *Id.* at 352 (Thomas, J., concurring); *cf. Soni v. Jaddou*, 103 F.4th 1271, 1273 (7th Cir. 2024) ("No review means no review; the statute does not need to list all of the many potential legal theories that are not reviewable." (citing *Patel*)). That conclusion follows from the Supreme Court's explanation that the canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings v.*

*Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). A court may not invoke constitutional avoidance to adopt an "implausible" reading of clear text, *id.* at 296–97, and reading a statute that forbids "judicial review of *any* determination," 8 U.S.C. § 1254a(b)(5)(a) to permit judicial review of *some* (here, constitutional) determinations is exactly that.

Nor would construing the statute as written raise a "serious constitutional question." *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975). Inferior federal courts "possess no jurisdiction but what is given them by the power that creates them," *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 33 (1812); *see also Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449 (1850) ("Courts created by statute can have no jurisdiction but such as the statute confers."), which means Congress "has the authority to deprive district courts of jurisdiction to decide particular kinds of claims," *Mullin v. Doe*, 609 U.S. at 353 (Thomas, J., concurring).

Nor does the Constitution require that every constitutional claim be remediable in court, as sovereign immunity, the political-question doctrine, and the absence of judicially manageable standards all leave constitutional claims unheard. *Id.* at 353–54. The relief the plaintiffs seek, moreover, is the continuation of a discretionary, temporary status that Congress created and could abolish whenever it likes. *See id.* at 356 (Thomas, J., concurring) (noting how TPS is "a government-created privilege, not a core private right"). Congress may commit the continuation of such a privilege to the political branches, subject to the political process rather than to litigation. *See id.* at 345 (majority opinion) ("Sometimes Congress decides

that the political process is the proper forum for remedying improper conduct."); *cf.* *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments *largely immune from judicial control*.'" (emphasis added) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977))). It has done so here.

### D. The Solicitor General's Litigating Position Does Not Resolve Jurisdiction.

At oral argument in *Mullin v. Doe*, the Solicitor General declined to press this jurisdictional argument, stating that the government "ha[d]n't disputed" in that case that constitutional claims survive § 1254a(b)(5)(A)'s bar and was "not asking the Court to revisit *Webster* . . . in this case," while noting that the government has contested the point elsewhere. Tr. of Oral Arg. 26–27, *Mullin v. Doe*, No. 25-1083 (U.S. Apr. 29, 2026). That was a case-specific litigating choice in a case the government won on the merits. It did not bind the courts, and it could not because a limitation on subject matter jurisdiction cannot be waived or forfeited by the parties. *Steel Co.*, 523 U.S. at 94–95; *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 179 (7th Cir. 1994) ("Subject matter jurisdiction cannot be waived[.]"). If this court agrees with defendants, this case should end there. If it does not, the plaintiffs' claims fail on the merits for the reasons that follow.[4]

[4] Defendants also argued below that 8 U.S.C. § 1252(f)(1), which withdraws lower-court jurisdiction to "enjoin or restrain the operation of" the covered provisions of the INA except as applied to an individual alien in removal proceedings, limits the relief available on the plaintiffs' claims. *See* R. 110 at 10–12. The district court

## III. Rational-Basis Review Governs Plaintiffs' Equal Protection Challenge, and the TPS Termination Here Easily Satisfies It.

The district court assumed, "as the Supreme Court assumed in *Mullin*," that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), supplies the relevant framework for equal protection claims under the Fifth Amendment against the federal government's immigration policymaking. Op. 23. The Supreme Court made that "assum[ption] for the sake of argument" because it could resolve the case without deciding the question. 609 U.S. at 347. But whether the plaintiffs have stated a plausible claim depends on *what* they must plausibly allege, and the answer to that inquiry is that rational-basis review applies.

### A. Under *Mandel* and *Hawaii*, a Facially Legitimate and Bona Fide Immigration Determination Is, at Most, Subject to Rational-Basis Review.

When the Executive Branch exercises Congress' delegated authority over the admission or continued presence of foreign nationals "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" constitutional interests asserted. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972). The Supreme Court has "reaffirmed and applied [that] deferential standard of review across different contexts and constitutional claims," including equal protection claims.

---

rejected that argument, holding that § 1252(f)(1) does not reach declaratory relief, vacatur, or postponement under 5 U.S.C. § 705. S. App'x 3–12. Because § 1252(f)(1) limits remedies rather than the viability of a claim, *Biden v. Texas*, 597 U.S. 785, 798–801 (2022), defendants do not press that argument here but preserve it for any further proceedings. *See Mullin v. Al Otro Lado*, 609 U.S. 258, 281–83 (2026) (Thomas, J., concurring).

*Hawaii*, 585 U.S. at 703 (citing *Fiallo*, 430 U.S. at 792–96, and *Kerry v. Din*, 576 U.S. 86, 103–04 (2015) (Kennedy, J., concurring in the judgment)). A TPS designation is a determination that eligible nationals of a designated foreign country may receive temporary protection from removal and remain in the United States during the period in which such status is in effect. Indeed, the TPS statute itself does not deem TPS beneficiaries as admitted and provides limited lawful nonimmigrant status. *Sanchez v. Mayorkas*, 593 U.S. 409, 414 (2021). The Secretary's termination notice supplied facially legitimate and bona fide reasons: specifically, both improved conditions in Burma and the national interest in security, public safety, foreign policy, and immigration integrity. 90 Fed. Reg. at 53,379–82. Under a conventional application of *Mandel*, then, the inquiry ends there. *See IRAP*, 961 F.3d at 648–51 (so holding as to Presidential Proclamation 9645).

### B. Challenges to the Executive's Immigration-Policy Judgments Receive Rational-Basis Review.

Taking *Fiallo*'s "largely immune from judicial control" point seriously (even for constitutional challenges), the Court in *Hawaii* held that an Executive immigration directive, "neutral on its face" and "addressing a matter within the core of executive responsibility," should be upheld so long as it "can reasonably be understood to result from a justification independent of unconstitutional grounds," which is rational-basis review. *Hawaii*, 585 U.S. at 704–05. The *Hawaii* Court reached that conclusion despite a record of statements by the President that those plaintiffs characterized as reflecting religious animus, and despite their invocation of the same "motivating factor" framework that the plaintiffs invoke here. *Id.* at 700–05.

That standard is not confined to the admission of foreign nationals at the border. The Supreme Court has long held that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens," and that "[t]he fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Mathews v. Diaz*, 426 U.S. 67, 79–80 (1976). *Diaz* concerned an equal protection challenge regarding the benefits available to foreign nationals already residing in the United States. This court applied *Diaz* to require rational-basis review of immigration-related classifications affecting persons present here. *City of Chicago v. Shalala*, 189 F.3d 598, 609 (7th Cir. 1999) ("We hold that *Mathews v. Diaz* requires the application of rational basis review[.]"). And distinguishing by nationality is permissible and pervasive in immigration law. *See Fiallo*, 430 U.S. at 792–96.

A TPS termination is the paradigm of the judgment these cases protect. The statute directs the Secretary to assess conditions in a foreign state, to consult with appropriate agencies, and (with designations under § 1254a(b)(1)(C)) to weigh the national interest. The resulting determination "implicate[s] relations with foreign powers" and involves "classifications defined . . . in the light of changing political and economic circumstances," *Diaz*, 426 U.S. at 81, in a domain where "the Executive's evaluation of the underlying facts is entitled to appropriate weight," *Hawaii*, 585 U.S. at 708; *see also Shiba v. Mullin*, 173 F.4th 895, 904 (7th Cir. 2026). The Supreme Court in *Mullin v. Doe* did not reject this framework. It simply declined to choose

between *Hawaii* and *Arlington Heights* because the Haiti plaintiffs lost under either, while holding that even under *Arlington Heights* "the immigration context is an important factor" for consideration. 609 U.S. at 346–47.

The plaintiffs will point to *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), where a plurality applied *Arlington Heights* to an equal protection challenge to the rescission of the deferred action for childhood arrivals ("DACA") policy. But the Chief Justice's opinion on that point was joined by only three other justices, *id.* at 33–36 (opinion of Roberts, C.J.), did not purport to displace *Hawaii* or *Diaz*, and rejected the claim by finding the cited statements "remote in time and made in unrelated contexts," ultimately holding that the disparate impact of a generally applicable immigration policy on non-white nationals could not establish discriminatory purpose, lest "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Id.* at 34–35. *Regents* thus supplies no basis for departing from rational-basis review here, and its reasoning confirms that the plaintiffs' claim would fail even under the framework they prefer.

The structure of the TPS statute confirms the point. TPS is conferred by designating "a foreign state," 8 U.S.C. § 1254a(b)(1), and extends to "nationals of the state," *id.* § 1254a(a)(1). Every designation, extension, and termination therefore classifies by nationality, and every termination disadvantages the nationals of one country relative to others. If *Arlington Heights* governed, every TPS designation or termination would be subject to a motive inquiry on the ground that it was necessarily

based on national origin, and the review bar Congress enacted would easily be circumvented by a constitutional label in every case. The Supreme Court has long recognized that distinctions based on nationality may be drawn in the immigration field by Congress or the Executive, and must be sustained unless wholly irrational. This is because the right "to exclude or to expel aliens, or any class of aliens, absolutely or upon certain conditions," is "an inherent and inalienable right of every sovereign and independent nation[.]" *Wong Wing v. United States*, 163 U.S. 228, 231 (1896); *see also Fiallo*, 430 U.S. at 794–96.

**C. The TPS Termination for Burma Survives Rational-Basis Review.**

Rational-basis review asks only whether the challenged action is "plausibly related to" a legitimate governmental objective. *Hawaii*, 585 U.S. at 705. The action must be afforded "a strong presumption of validity," and "those attacking the rationality of the [governmental action] have the burden to negative every conceivable basis which might support it." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (cleaned up). And critically, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the" decisionmaker. *Id.* at 315. The termination of Burma's TPS designation readily satisfies this standard.

The Secretary applied the statute's own review criteria, found improvement in country conditions, and determined that continued presence of Burmese nationals was contrary to the national interest for reasons of national security, public safety, foreign policy, and immigration integrity. 90 Fed. Reg. at 53,379–82. Terminating a humanitarian designation under a statutory framework that is temporary by default,

*see* 8 U.S.C. § 1254a(b)(2)(B), (b)(3), is rationally related to that program's temporary character, to immigration enforcement, and to the conduct of foreign relations. The plaintiffs' theory that the administration prefers tighter immigration and dislikes TPS as administered by its predecessors describes legitimate policy differences, showing that "one may oppose TPS and favor tighter restrictions on immigration for economic or other reasons that have nothing to do with race." *Mullin v. Doe*, 609 U.S. at 348.

Further, because actual motive is irrelevant under rational-basis review, the district court's procedural-posture distinction vis-à-vis *Mullin v. Doe* and this case should have no purchase. That is precisely how the Fourth Circuit resolved the identical maneuver after *Trump v. Hawaii*. There, the district court denied a Rule 12(b)(6) motion to dismiss constitutional challenges to Presidential Proclamation 9645, reasoning that *Hawaii* had resolved only a preliminary injunction on a limited record and did not answer whether the plaintiffs had stated a plausible claim. *IRAP*, 961 F.3d at 639, 645–46. On interlocutory appeal under § 1292(b), the Fourth Circuit reversed with instructions to dismiss with prejudice, holding that the plaintiffs' hope that discovery would reveal the actual motivation for the Proclamation "fail[ed] to account for the extremely deferential nature of the rational basis standard," under which it is irrelevant "whether the conceived reason for the challenged distinction actually motivated the decisionmaker." *Id.* at 653–54 (quoting *Beach Commc'ns*, 508 U.S. at 315). There is no reason why this case should be treated any differently.

## IV. Even Under *Arlington Heights*, the Complaint Does Not State a Plausible Claim After *Mullin v. Doe*.

### A. Where a Complaint's Allegations Are Equally Consistent with an Obvious, Lawful Explanation, the Plaintiffs Do Not State a Plausible Claim.

To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The inquiry is "context-specific," and where there is an "obvious alternative explanation" for the conduct alleged, purposeful discrimination "is not a plausible conclusion." *Id.* at 679–82 (quoting *Twombly*, 550 U.S. at 567). Indeed, *Iqbal* applied this rule to dismiss an allegation that the Attorney General and the FBI Director adopted a detention policy because of the detainees' race, religion, and national origin, because the policy was more likely explained by a legitimate purpose that was wholly unrelated to the conclusory allegations in that complaint. *See id.* at 681–82.

The Supreme Court reaffirmed this principle in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). *Vullo* faulted the Second Circuit for taking the complaint's allegations in isolation and crediting an alternative explanation that the court of appeals had constructed for the defendant, rather than drawing reasonable inferences from the allegations as a whole. *Id.* at 195–97. But nothing in *Vullo* disturbs *Iqbal*'s rule that an obvious alternative explanation defeats facial

plausibility. The question is always whether, viewing the allegations as a whole, the inference of unlawful purpose is plausible rather than merely *possible*.

### B. The Court's Opinion in *Mullin v. Doe* Characterized the Same Evidence and Identified the Obvious Alternative Explanation.

What distinguishes this case from a typical Rule 12(b)(6) dispute is that the Supreme Court has *already evaluated* the evidentiary universe on which the plaintiffs' claim rests. In *Mullin v. Doe*, the Haiti plaintiffs relied on statements by the President and the Secretary and on the administration's termination of every TPS designation that had come up for review. The Court sorted the President's statements into four categories (specifically, objections to recent immigration and immigrants associated with crime, displeasure with TPS, denigration of TPS-designated countries, and statements maligning Haitians) and the Secretary's statements into three. *See Mullin v. Doe*, 609 U.S. at 347–48. The Court then held that "[n]one of the cited statements by either the President or the Secretary was overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Id.* at 348. It held that "whatever one may think of the cited statements, they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Id.* at 349. And the Court identified "a strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.*

Moreover, the Court addressed the TPS termination pattern directly. The 13 countries whose designations were terminated (Burma among them) included

"nations in East Asia (Nepal and Burma), Central Asia (Afghanistan), the Middle East (Syria and Yemen), Africa (Somalia, Ethiopia, South Sudan, and Cameroon), Central America (Nicaragua and Honduras), South America (Venezuela), and the Caribbean (Haiti)," and "[m]ost would regard this as a racially diverse group of countries." *Id.* at 349. The Court rejected the inference that terminating designations only for "non-white" nations shows racial purpose, and that "[t]he great majority of countries granted TPS have ranked among the poorest nations of the world." *Id.* at 349–50. It consequently concluded that, "[v]iewing all the relevant evidence," the Haiti plaintiffs were "unlikely to prove that race was a motivating factor[.]" *Id.* at 350. And when those same plaintiffs proffered newly discovered evidence from yet another TPS litigation, the Court found it "cumulative of other evidence in the record[.]" *Id.* at 350 n.7.

These are not findings about the weight of competing evidence in a preliminary record. They are characterizations of what the proffered evidence is and what it can show, concluding that the statements are not overtly racial, that they express policy views resting on race-neutral justifications, that the termination pattern is racially diverse, and that the decisionmaking as a whole is thus explained by an obvious, lawful alternative. Those characterizations do not change when the same statements are pleaded in a complaint rather than offered in support of a motion for preliminary relief, and they were joined by six justices. *See id.* at 326 (syllabus); *see also id.* at 350 (Thomas, J., concurring) ("I join the opinion of the Court in full.").

### C. The District Court's Distinction Between Procedural Postures Does Not Hold Up.

The district court gave three reasons for declining to apply *Mullin v. Doe*'s reasoning. But none withstands scrutiny.

*First*, the district court reasoned that *Mullin* "was decided under a likelihood of success standard" and "did not decide that the plaintiffs had failed to state a plausible claim for relief." S. App'x 23–24. That is true but beside the point. The question is not whether *Mullin v. Doe*'s holding is formally identical to a Rule 12(b)(6) ruling, but whether *Mullin v. Doe*'s reasoning, applied to materially the same allegations, leaves room for a plausible inference of racial purpose. The district court itself answered that question: "Following the reasoning in *Mullin*, the same could be said of the allegations here." Op. 24. If the Supreme Court's characterization of these statements is correct (and a lower court is not free to assume otherwise), then the complaint, at most, pleads facts "merely consistent with" discrimination, *Twombly*, 550 U.S. at 557, with an "obvious alternative explanation," *Iqbal*, 556 U.S. at 682, that the Supreme Court has already identified. That is the definition of implausibility under *Iqbal*. An inferior court is bound to follow the Supreme Court's reasoning, not to confine it. And a lower court may not re-characterize evidence the Supreme Court has already characterized by invoking the standard under which the Court did so.

The Fourth Circuit confronted exactly this type of situation in *IRAP*. The district court there held that *Hawaii* did not control at the pleading stage because the Supreme Court had decided only that the plaintiffs were "not likely to succeed on the

merits" on a "limited record." *IRAP*, 961 F.3d at 646, 653. The Fourth Circuit disagreed: "while it is true that the Court's holding in *Hawaii* was that the plaintiffs there had failed to show 'that they [were] likely to succeed on the merits of their claims,' the reason for that holding was the Court's predicate unconditional conclusion" about the challenged action—a conclusion that "was not stated on a 'likelihood' basis." *Id.* at 653. The same is true here, because *Mullin v. Doe*'s predicate conclusions concerning the racial-discrimination claims (that the statements were not overtly racial, that they rested on race-neutral justifications, that the pattern was racially diverse, and that a strong race-neutral explanation existed) were stated unconditionally.

*Second*, the district court reasoned that *Arlington Heights* calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." S. App'x 24 (quoting 429 U.S. at 266). The Supreme Court conducted that inquiry in *Mullin v. Doe*, but noted how the "immigration context" is "an important factor." 609 U.S. at 347. This means that *Arlington Heights* does not displace *Iqbal*. A plaintiff alleging discriminatory purpose must still plead facts from which that purpose can plausibly be inferred, and *Iqbal* itself was a discriminatory-purpose case dismissed at the pleading stage because the alleged conduct was more likely explained by a lawful purpose. 556 U.S. at 681–82. *Arlington Heights*'s catalog of circumstantial evidence (such as disparate impact, historical background, departures from procedure) is a guide to what *might* support an inference of purpose. It is not an

exemption from the pleading requirement that a complaint's inferences must be plausible.

*Third*, the district court reasoned that "it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*," and that if *Mullin v. Doe*'s reasoning sufficed, "it is hard to see what evidence, short of an outright admission that racial animus motivated the decision to terminate TPS, would help the plaintiffs." S. App'x 24–25. That approach is wrong because it inverts the pleading standard. *Twombly* and *Iqbal* exist precisely to prevent a plaintiff from using discovery to search for a claim the complaint has not plausibly stated. "It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process." *Twombly*, 550 U.S. at 559. And "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. That the plaintiffs may find it difficult to plead a plausible claim of racial purpose is the consequence of the Supreme Court's conclusion that the available evidence does not show one. It is not a reason to permit plaintiffs' requested discovery into the motives of the President and a Cabinet officer in the hope that the Supreme Court got it wrong.

The district court's concern is particularly misplaced in this setting. The discovery the plaintiffs seek would probe the deliberations and motivations of the Executive Branch regarding foreign states and the potential need for temporary humanitarian protections, which the Court has described as implicating "the core of executive responsibility." *Hawaii*, 585 U.S. at 702. The Court has repeatedly

cautioned that the "high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Cheney v. United States District Court*, 542 U.S. 367, 385 (2004) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 (1997)). A plausibility standard that could be satisfied by the *hope* of finding something in Executive Branch deliberations would invite intrusion in every immigration case.

### D. The Plaintiffs' Allegations Here Are Weaker Than the Showing *Mullin v. Doe* Found Insufficient.

The district court correctly recognized that plaintiffs here "rely upon much of the same evidence" as the Haiti plaintiffs and that "[s]ome of the Haiti-specific statements in *Mullin* do not apply equally to Burma." Op. 23. The amended complaint confirms that plaintiffs' Burma-specific showing is even more meager.

The statements that plaintiffs cite principally concern *other* countries and immigration generally. Am. Compl. ¶¶ 123–64. Their principal Burma-specific allegation is that, in July 2019 (more than six years before the challenged termination) the President indicated that he did not know where Burma was. *Id.* at ¶ 132. A statement that remote in time and made in a wholly unrelated context is not probative of the purpose behind a decision made years later by a different official. *See Regents*, 591 U.S. at 35 (opinion of Roberts, C.J.). Nor can statements by the President establish the purpose *of the Secretary*, the official whom the statute charges with the determination, absent allegations connecting them to the decision. *Cf. Staub v. Proctor Hospital*, 562 U.S. 411, 418 (2011) ("[T]he malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold

the principal liable for a tort that requires both.”). The plaintiffs allege that the President has “authority and influence” over the Secretary, but that is true of every Cabinet decision and would convert every presidential statement into evidence of every subordinate’s motive.

The plaintiffs have emphasized former Secretary Noem’s statements—describing certain immigrants as “dirt bags” and “criminals,” characterizing migration as “an invasion,” and referring to nationals of travel-ban countries as “killers,” “leeches,” and “foreign invaders.” Am. Compl. ¶¶ 124–25, 129. These are statements that *Mullin* examined. The Court sorted them into three categories (statements “express[ing] antipathy toward travelers from countries covered by a renewed travel ban,” “derogatory comments about immigration and its effects,” and statements that “promised changes and criticized past implementation of TPS”) and held that none “was overtly racial” and that “in substance all expressed policy views that could rest on race-neutral justifications,” because “one may oppose TPS and favor tighter restrictions on immigration for economic or other reasons that have nothing to do with race.” 609 U.S. at 347–48. Hostility to immigration in general is not evidence of racial purpose for Burma’s specific TPS designation, and the plaintiffs identify nothing in these statements that distinguishes them from the other categories the Court characterized.

The Supreme Court has already held that the across-the-board pattern of TPS terminations—including Burma—reflects “a racially diverse group of countries” and is explained by the administration’s stance on immigration and TPS rather than by

race. *Mullin v. Doe*, 609 U.S. at 349. And plaintiffs' theory that the group is nonetheless uniformly "non-white" is the same theory the Court considered and rejected. *Id.* at 349–50. The Court observed that the Haiti plaintiffs' "definition of a predominantly non-white nation [wa]s broad, apparently encompassing major European countries," such that "only the termination of a TPS designation for a Nordic or Germanic country would be sufficient in their judgment to show that the Secretary's unbroken record of TPS terminations was race-neutral." *Id.* at 349. A theory under which no termination short of a Scandinavian one could be race-neutral is not a plausible allegation of discriminatory purpose.

The plaintiffs have also argued that the Secretary's alleged failure to consult appropriate agencies and reliance on "irrelevant factors" are "[d]epartures from the normal procedural sequence" that *Arlington Heights* treats as circumstantial evidence of intent. 429 U.S. at 267. They are not. Those allegations are the plaintiffs' APA claims (indeed, the claims *Mullin v. Doe* held are unreviewable) relabeled as evidence of discriminatory purpose, which is precisely the "creative pleading or clever lawyering" *Mullin v. Doe* forbids. 609 U.S. at 344. And on their own terms, they prove nothing. This is because the TPS termination notice recites consultation with appropriate agencies, 90 Fed. Reg. at 53,379, and consideration of the national interest is not an "irrelevant factor," but a statutory one for a designation made under § 1254a(b)(1)(C). To the extent the plaintiffs contend that the stated reasons were pretextual, pretext is cognizable only on plausible allegations that the agency's sole stated reason was contrived, because it is "typical" for an agency to have "both stated

and unstated reasons for a decision[.]" *Dep't of Commerce v. New York*, 588 U.S. 752, 784 (2019). The amended complaint alleges, at most, that the administration's stated reasons coexisted with its well-known policy preference against TPS, which is the race-neutral explanation *Mullin v. Doe* identified and not evidence against it.

Finally, the plaintiffs' disparate-impact theory (that TPS terminations fall largely on non-white foreign nationals) proves nothing, because nearly every country ever designated for TPS has a majority non-white population. Here again, the plaintiffs' logic would mean that "virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Regents*, 591 U.S. at 34 (opinion of Roberts, C.J.). The Supreme Court rejected that logic in *Regents* and again in *Mullin v. Doe*. 609 U.S. at 349–50. That rule should apply here.

## V. The District Court Correctly Dismissed the Plaintiffs' Remaining Claims.

The plaintiffs did not cross-petition for permission to appeal, Fed. R. App. P. 5(b)(2), and an appellee who has not cross-appealed may defend the judgment on any ground but may not obtain its alteration in its own favor. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 244–45 (2008). The dismissals of the plaintiffs' other claims are therefore not before this court for reversal. They are, however, part of the certified order, *Yamaha*, 516 U.S. at 205, the plaintiffs have moved the district court to reconsider two of them, R. 117, and the plaintiffs are likely to argue that the race-discrimination theory is not the only thing standing between the defendants and the end of this litigation. The defendants therefore address the dismissals briefly, to show that the district court correctly disposed of every claim but the one on appeal.

### A. The Secretary Has Authority to Terminate TPS Designations.

The plaintiffs' ultra vires theory is that because the TPS statute refers to the Attorney General, only the Attorney General may terminate a designation. The district court correctly rejected that argument. S. App'x 14–19. As noted above, the Homeland Security Act of 2002 charged the Secretary of Homeland Security "with the administration and enforcement of" the immigration laws, 8 U.S.C. § 1103(a)(1); provided that references to any officer whose functions were transferred "shall be deemed to refer to the Secretary," 6 U.S.C. § 557; and reserved to the Attorney General only the functions previously exercised by the Executive Office for Immigration Review, 8 U.S.C. § 1103(g) (essentially, supervising the immigration court system).

Reading § 1103(a)'s carve-out for functions "conferred upon" the Attorney General to preserve every residual reference to the Attorney General in the 1952 enactment of the INA (as the plaintiffs will argue), would render § 1103(g) superfluous and would undo the transfer Congress plainly made. S. App'x 16–17. The Supreme Court has recognized the transfer, *see Preap*, 586 U.S. at 398 n.2, and in *Mullin v. Doe*, the Court even quoted the review bar with the Secretary substituted for the Attorney General, *see* 609 U.S. at 338. Every court to consider the question has agreed, and the theory is self-defeating because if the Secretary lacked authority to terminate Burma's designation, the Secretary also lacked authority to make such a designation, meaning the plaintiffs would have no status to protect. S. App'x 18.

### B. Plaintiffs' APA Claims Are Barred by § 1254a(b)(5)(A).

The plaintiffs' APA claims (specifically, that the Secretary failed to consult

appropriate agencies, failed to adequately review country conditions, relied on pretextual reasons, and departed from past practice on the wind-down period) are the claims the Court has already held are unreviewable. *Mullin v. Doe*, 609 U.S. at 338–45. The district court correctly so held once it concluded that the Secretary is the officer whose determinations the bar protects. S. App'x 19. The plaintiffs' only answer below was that the bar would not apply if their ultra vires theory were correct, but it is not.

**C. Plaintiffs' Procedural Due Process Claim Fails As a Matter of Law.**

The plaintiffs' due process theory is that the Secretary's alleged failures to consult appropriate agencies, to review country conditions, and to publish the actual basis for the determination, deprived them of constitutionally adequate process. S. App'x 19. The district court assumed in the plaintiffs' favor that they hold a protected interest and that the termination is adjudicative rather than legislative, but held that the alleged defects nonetheless do not state a due process violation. S. App'x 20. That conclusion was correct.

"The core of due process is notice and an opportunity to be heard." S. App'x 20 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)). The TPS termination here was published in the *Federal Register*, which provided notice. And interagency consultation with appropriate agencies is a statutory requirement, not a constitutional one. S. App'x 20–21. This court has long held that "it is appropriate to consider the Constitution only if the statute and regulations are deficient," and that "intoning 'due process'" adds nothing to a claim that an agency failed to follow a statutory procedure. *Portillo-Rendon v. Holder*, 662 F.3d 815, 817 (7th Cir. 2011).

And plaintiffs' counsel conceded as much at the hearing below, agreeing that the "elements" of the due process claim are "the same" as those of the barred statutory claim and that "there is no case that specifically says" that statutory process is what the Due Process Clause requires. Supp. App'x 131–32. The district court's dismissal was therefore correct because the plaintiffs merely dressed up their APA claims in constitutional terms. *See Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1443 (7th Cir. 1996) (en banc) (rejecting "a case . . . cloaked in constitutional terms" where the plaintiff "affixed the constitutional label to a garden-variety claim for benefits plainly barred by" statute). Nor do the procedures the plaintiffs invoke bear any relation to the risk of erroneous deprivation of an individual interest, which is what the Due Process Clause protects against. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Interagency consultation with appropriate agencies is a check on the Secretary's country-level judgment, not a personal safeguard for any specific plaintiff. And the contention that the agency's published rationale was not the "actual" one is a demand for a different outcome dressed as a demand for more process.

Plaintiffs' due process claim would fail at the threshold in any event. A benefit is not a protected entitlement "if government officials may grant or deny it in their discretion," *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005), and the TPS statute places no substantive limitation on the Secretary's determination whether a designation should continue, *cf. Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 462–63 (1989) (there must be mandatory language in order to create a liberty interest). TPS beneficiaries receive future benefits here only if the Secretary

extends a designation, which means that they have nothing "more than a unilateral expectation" in its continuation. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). And a country-wide determination resting on foreign conditions, applying uniformly to every national of that country, is legislative in character, which means the process due to each TPS beneficiary is the notice Congress provided. *See Bi-Metallic Investment Co. v. State Board of Equalization*, 239 U.S. 441, 445 (1915); *Goros v. County of Cook*, 489 F.3d 857, 859–60 (7th Cir. 2007).

### D. Plaintiffs' "Bare Animus" Theory Fails for the Same Reasons Their Race-Discrimination Theory Fails.

The plaintiffs' alternative equal protection theory is that the termination reflects "a bare . . . desire to harm" TPS holders as "a politically unpopular group." *Romer v. Evans*, 517 U.S. 620, 634 (1996). The district court correctly dismissed that claim because "there is a distinction between bare desire to harm TPS holders and animus against TPS policy (and immigration as a whole)," and "[t]he Supreme Court's reasoning in *Mullin* points to the latter, not the former." S. App'x 25. That is *Romer*'s own distinction. Laws enacted for broad purposes "often can be explained by reference to legitimate public policies which justify the incidental disadvantages they impose on certain persons," *Romer*, 517 U.S. at 635, and the Supreme Court has identified the policy here to be "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Mullin v. Doe*, 609 U.S. at 349.

Put another way, opposition to an immigration program is not animus toward the specific persons who benefit from it. Were it otherwise, every decision to end a

benefit program could be recast as a desire to harm that program's beneficiaries. The allegations the plaintiffs use here (again, statements disparaging TPS, terminations of other designations, the travel ban, the pace of implementation after *Mullin v. Doe*) are at least as consistent with political opposition to the TPS program as with alleged hostility toward persons, which is all *Iqbal* requires to defeat the inference. 556 U.S. at 678, 682. And because this theory (like plaintiffs' race-discrimination theory) challenges an Executive immigration-policy judgment, rational-basis review governs it, under which the decisionmaker's motive is irrelevant. *See supra* at Part III.

Incidentally, the plaintiffs' "bare animus" theory is not a separate claim. The plaintiffs pleaded one equal protection count resting on two theories, *see* Am. Compl. ¶¶ 218–23, and the district court resolved both on a single motion in a single ruling, *see* S. App'x 22–25. If this court holds that the race-discrimination theory fails, the animus theory (resting on the same allegations and the same obvious alternative explanation) should necessarily fail with it, and nothing remains of the plaintiffs' case.

## VI. The Plaintiffs Should Not Be Permitted to Proceed Under Pseudonyms.

This court has directed the parties to address whether the plaintiffs should be allowed to continue to proceed under pseudonyms. *Mullin v. Doe*, No. 26-8018, Dkt. 7, at 2. They should not. The defendants did not oppose the plaintiffs' motion in the district court, Supp. App'x 109, but this court has made clear that the public's interest in open proceedings is not for the parties' to waive, and that a district court's grant of anonymity, entered without findings, does not satisfy the "careful and demanding

balancing of interests" that is required for pseudonymous litigation. *Trustees*, 101 F.4th at 492 (quotations omitted).

### A. The Norm in Federal Litigation Is That Parties' Names Be Public, and Departures From That Norm Require a Substantial, Evidence-Based Risk of Harm.

As this court has previously explained, "[t]he norm in federal litigation is that all parties' names are public." *Trustees*, 101 F.4th at 491; *see also* Fed. R. Civ. P. 10(a) ("The title of the complaint must name all the parties[.]"). "Judicial proceedings are open to the public, which has an interest in knowing the who and the how about the behavior of both judges and those who call on the large subsidy of the legal system." *Trustees*, 101 F.4th at 491. Acknowledging this important principle, this court has "repeatedly voiced [its] disfavor of parties proceeding anonymously, as anonymous litigation runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." *Doe v. Village of Deerfield*, 819 F.3d 372, 376–77 (7th Cir. 2016). To proceed anonymously, a party must demonstrate "exceptional circumstances" that outweigh both the public policy in favor of identified parties and any prejudice to opposing parties. *Id.* at 377; *see also Doe v. Univ. of S. Ind.*, 172 F.4th 511, 514 (7th Cir. 2026) (there is a "strong presumption in favor of requiring adult parties to litigate under their real names").

The showing required is also specific. "A substantial risk of harm—either physical harm or retaliation by third parties, beyond the reaction legitimately attached to the truth of events as determined in court—may justify anonymity." *Trustees*, 101 F.4th at 491. But this court has "refused to allow plaintiffs to proceed anonymously merely to avoid embarrassment," *Roe v. Dettelbach*, 59 F.4th 255, 259

(7th Cir. 2023), or reputational harm, *Doe v. Young*, No. 24-2871, 2025 WL 927320, at *2 (7th Cir. Mar. 27, 2025), and a movant "must show[] that the harm to the [party] . . . exceeds the likely harm from concealment," *Dettelbach*, 59 F.4th at 259. Arguments resting on "overly broad assumptions" rather than "evidence of a substantial risk of harm directed towards" the litigant do not suffice. *Young*, 2025 WL 927320, at *1. And because the determination requires findings, a court may not properly find a risk of physical harm or retaliation "without an evidentiary hearing." *Trustees*, 101 F.4th at 492. But the district court here made no such findings. It granted the plaintiffs' motion without a hearing and without the balancing this court requires. Supp. App'x 124.

### B. The Plaintiffs' Asserted Justifications for Pseudonymity Here Do Not Establish Exceptional Circumstances.

The plaintiffs offered three justifications for pseudonymity in the district court, *see* Supp. App'x 111–12, but none meets this court's standard.

*Retaliation by the United States*. The plaintiffs' principal contention is that identifying themselves would expose them to "retaliation" by federal immigration authorities (such as arrest, detention, and removal) for challenging government policy. Supp. App'x 112. But the enforcement of immigration laws against persons without status is not "retaliation . . . beyond the reaction legitimately attached to the truth of events." *Trustees*, 101 F.4th at 491. It is the lawful consequence of a status that the plaintiffs themselves put at issue by filing this suit. *Cf. Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491–92 (1999) ("When an alien's continuing presence in this country is in violation of the immigration laws, the

Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity.")

In other words, this court does not permit a litigant to shield his identity from the ordinary legal consequences of the facts he pleads. *Trustees*, 101 F.4th at 491–92 (discussing how someone charged with a crime may be shunned or lose employment, "but a court would not call that 'retaliation' that justifies anonymity"). Moreover, foreign nationals regularly litigate against the government in their own names every day—in petitions for review of removal orders, in habeas proceedings, and in APA suits—and the Federal Rules already afford them targeted privacy protections that do not depend on anonymity. *See* Fed. R. Civ. P. 5.2(c) (limiting remote electronic access to the record in immigration cases); Fed. R. App. P. 25(a)(5) (applying Rule 5.2 on appeal). And the plaintiffs have not alleged (let alone shown) that the government has retaliated against *any* TPS litigant for suing.

*Conditions in Burma.* The plaintiffs next contend that if they are removed to Burma, their participation in this litigation would expose them to persecution by the military regime. Supp. App'x 117–19. But the Secretary addressed the conditions in Burma in the termination notice, and this court requires evidence of a substantial risk "directed towards" the litigant. *Young*, 2025 WL 927320, at *1. Not generalized assertions about a foreign government. Thus, while it is true that the plaintiffs' declarations describe political activity in Burma and their fear of its consequences, *see* Supp. App'x at 116–19, they do not show that *this* litigation (a challenge to a

United States regulatory decision, in which the plaintiffs' individual histories play no role) would bring them to the Burmese government's attention or alter the risk they already describe.

The same fear could be asserted and litigated under real names in every asylum and withholding-of-removal proceeding involving Burma. Yet those cases typically proceed in courts of appeals by name as a matter of course. If fear of a foreign regime justified anonymity whenever a foreign national challenges an immigration decision, the exception would swallow the rule in an entire category of federal litigation. *Cf. Trustees*, 101 F.4th at 492 (rejecting the argument that a category of cases carries an "easement across the norm of using litigants' names").

*Sensitivity of immigration status*. Relatedly, the plaintiffs contend that their immigration status is sensitive personal information. *See* Supp. App'x 112, 115. Here again, however, most litigation will "frequently invade customary notions of privacy and—in the bargain—threaten parties' reputations." *Univ. of S. Ind.*, 172 F.4th at 515 (quotations omitted). Further, the plaintiffs' TPS status is the premise of their suit, not an incidental disclosure, and it is a status shared with thousands of others. It is not information of the kind (such as the details of sexual conduct or medical treatment) that this court has recognized as potentially supporting anonymity. *See Trustees*, 101 F.4th at 492. Nor is this a case in which the plaintiffs are minors. *Id.* at 491.

Defendants do not ask this court to publish the plaintiffs' names unilaterally. Rather, consistent with *Doe v. Smith*, 429 F.3d 706, 710 (7th Cir. 2005), and *Trustees*,

101 F.4th at 493, the plaintiffs should be afforded the choice this court has afforded other litigants whose anonymity was found unjustified: to proceed in their own names or to withdraw. Because this is a putative class action with six named plaintiffs, any plaintiff unwilling to proceed by name may withdraw as a named representative without prejudice to the putative class allegations. At a minimum, though, this court should direct the district court on any remand to conduct the evidentiary inquiry this court's decisions require rather than allow the plaintiffs to continue pseudonymously.

## Conclusion

For the foregoing reasons, the order of the district court denying defendants' motion to dismiss the plaintiffs' race-discrimination equal protection claim should be reversed, and this case remanded with instructions to dismiss that claim. This court should further direct that plaintiffs may not proceed under pseudonyms.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

THOMAS P. WALSH
Assistant United States Attorney
Civil Division Chief

s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

**Certificate of Compliance with Rule 32(a)**

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,600 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

Dated: October 26, 2026

## Certificate of Service

I hereby certify that on October 26, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

The participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

s/ Joshua S. Press

JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

## Certificate of Compliance with Rule 30(d)

I certify that all materials required under Circuit Rule 30(a) are included in the attached short appendix, and that all materials required under Circuit Rule 30(b) are included in the supplemental appendix filed simultaneously with this brief.

s/ Joshua S. Press

JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

# Required Short Appendix

## Index for Short Appendix

Order of the District Court Judge Partially Granting Defendants' Motion to Dismiss, dated August 7, 2026, R. 115 ........................................................ 1- 26

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **AUNG DOE, et al., on their own behalf and on behalf of others similarly situated,** | ) | |
| **Plaintiffs,** | ) | |
| **vs.** | ) | **Case No. 25 C 15483** |
| **MARKWAYNE MULLIN, SECRETARY, UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Throughout 2025, then-Secretary of the United States Department of Homeland Security (DHS) Kristi Noem decided to terminate multiple countries' designation for Temporary Protected Status (TPS). This case concerns the decision to terminate Burma's designation. For the second time, the plaintiffs have moved to postpone the termination under section 705 of the Administrative Procedure Act (APA). 5 U.S.C. § 705. The government has moved to dismiss the plaintiffs' amended complaint. The Court assumes familiarity with the case and therefore provides only a sketch of the facts and procedural history relevant to the present motions.

The plaintiffs, six Burmese nationals, initially raised APA and Fifth Amendment equal protection challenges to the termination. The Court granted the plaintiffs' motion

to postpone the effective date of the termination, finding that it had jurisdiction over the claims and that the plaintiffs had demonstrated a likelihood of success on their APA challenges. *Doe v. Noem*, 822 F. Supp. 3d 893, 901 (N.D. Ill. 2026). On June 25, 2026, while this Court's postponement order was on appeal, the Supreme Court reversed postponement orders based on similar APA and equal protection challenges to the Secretary's decision to terminate Haiti and Syria's TPS designations. *Mullin v. Doe*, 146 S. Ct. 2121, 2127–28 (2026). The Court held that a jurisdiction-stripping provision in the TPS statute, 8 U.S.C. § 1254a(b)(5)(A), bars judicial review of nonconstitutional challenges to TPS termination decisions and that the Haiti plaintiffs had not shown a likelihood of success on their race-discrimination equal protection claim, which was the only constitutional claim before the Supreme Court. *Mullin v. Doe*, 146 S. Ct. at 2127–28. The Seventh Circuit then reversed the postponement order in this case and remanded the case to this Court for further proceedings in light of and consistent with the Supreme Court's decision. *Doe v. Mullin*, No. 26-1294, 2026 WL 2093686, at *1 (7th Cir. July 16, 2026).

The plaintiffs have filed an amended complaint adding three new claims to their previous APA and equal protection challenges. First, they assert that the Secretary's termination decision was *ultra vires* on the theory that the Attorney General, not the Secretary, has the authority to terminate TPS designations. Second, they contend that the termination decision violated their procedural due process rights by not adhering to certain processes in the TPS statute. Third, they advance a new equal protection theory in addition to their race-discrimination theory: that the TPS termination reflects a "bare animus" against TPS holders. The plaintiffs have also filed a second motion to

postpone the effective date of the termination based solely on the new *ultra vires* and due process claims. The government has responded with a motion to dismiss the plaintiffs' amended complaint.

For the reasons below, the Court denies the plaintiffs' motion for postponement and grants the government's motion to dismiss the APA, *ultra vires*, due process, and bare-animus equal protection claims. The Court denies the government's motion to dismiss the race-discrimination equal protection claim and certifies this issue for interlocutory appeal under 28 U.S.C. § 1292(b).

**Discussion**

As a threshold matter, the government has renewed its argument that 8 U.S.C. § 1252(f)(1), a different jurisdictional bar from the one addressed by the Supreme Court in *Mullin*, strips this Court of authority to grant the plaintiffs' requested relief. The Court starts with that argument. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101–02 (1998). *But see Biden v. Texas*, 597 U.S. 785, 798 (2022) (holding that section 1252(f)(1) is a limitation on remedial powers, not subject-matter jurisdiction); *Mullin v. Doe*, 146 S. Ct. at 2137 (stating in a portion of the opinion that did not command a majority of the Court that *Steel Co.* does not prevent a court from denying a motion for preliminary relief based on the merits without first assessing jurisdiction).

**A. Section 1252(f)(1)**

8 U.S.C. § 1252(f)(1) was enacted as part of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and provides, in full:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by [IIRIRA], other than



AUNGDOE000003

> with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1). In the U.S. Code, section 1252 is in subchapter II. Part IV of subchapter II is titled "Inspection, Apprehension, Examination, Exclusion, and Removal" and covers 8 U.S.C. §§ 1221–1232. The TPS statute, 8 U.S.C. § 1254a, is in part V, not part IV. So, based on the U.S. Code, 8 U.S.C. § 1252(f)(1) does not apply to the TPS statute.

The government's counterargument is that the U.S. Code deviates from the statutes at large, and in the event of a conflict between the two, the statutes at large control. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 448 (1993); 1 U.S.C. § 112; *id.* § 204. There are two relevant differences. First, section 242(f)(1) of the Immigration and Nationality Act (INA)—the statutes at large analog to 8 U.S.C. § 1252(f)(1)—cross-references "chapter 4 of title II," the organization within the statutes at large. IIRIRA, Pub. L. No. 104-208, div. C, sec. 306(a)(2), 110 Stat. 3009-546, 3009-614. Second, the public law for IIRIRA contains an amendment titled "Conforming Amendment to Table of Contents; Overview of Reorganized Chapters," which lists the TPS statute under chapter 4 instead of chapter 5, where it was previously. *Id.* sec. 308(a)(2). So, in the statutes at large, subsection (f)(1) appears to apply to the TPS statute.

A few issues inject some uncertainty into the government's reading. For one, as the Court previously noted, the Supreme Court has repeatedly read subsection (f)(1) as applying to 8 U.S.C. §§ 1221–1232, the provisions in part IV of subchapter II of the U.S. Code. *See, e.g.*, *Biden*, 597 U.S. at 797; *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022); *Nielsen v. Preap*, 586 U.S. 392, 402 (2019) (Alito, J., joined by Roberts,

C.J., and Kavanaugh, J.); *id.* at 424 (Thomas, J., concurring); *Jennings v. Rodriguez*, 583 U.S. 281, 312 (2018); *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). *But see Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022).

The apparent move of the TPS statute to chapter IV is also somewhat unusual. Before IIRIRA, chapter 4 dealt with "Entry and Exclusion," and chapter 5 addressed "Deportation" and "Adjustment of Status." *See* INA, Pub. L. No. 82-414, ch. 477, 66 Stat. 163, 163 (1952). IIRIRA revised the INA to combine "deportation" and "exclusion" proceedings into one "removal" procedure. *See Cirrus Rojas v. Olson*, No. 25-3127, 2026 WL 2198315, at *13 (7th Cir. July 30, 2026). As part of that restructuring, chapter 4 was renamed "Inspection, Apprehension, Examination, Exclusion, and Removal," and chapter 5 was renamed "Adjustment and Change of Status." *See* IIRIRA sec. 308(a)(2). The TPS statute seems to fit most naturally in the latter. *See Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 825 (N.D. Cal. 2025).

Additionally, subsection (f)(1) seems to be a poor fit for the TPS statute. For whatever provisions subsection (f)(1) applies to, it says that courts may "enjoin or restrain the operation of" those provisions only "with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." 8 U.S.C. § 1252(f)(1). As applied to 8 U.S.C. §§ 1221–1232, provisions that deal with issues like admissibility, detention, and removal, that makes sense: it precludes class-wide injunctive relief but permits courts to enjoin admissibility, detention, and removal proceedings against individual noncitizens. *See Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 481–82. In contrast, subsection (f)(1)'s language is an uncomfortable fit for the TPS statute. This case illustrates the point. The plaintiffs



AUNGDOE000005

claim that the Secretary failed to comply with 8 U.S.C. § 1254a(b)(3)(A), which requires the Secretary to consult with appropriate agencies and review conditions in the foreign state. That provision governs the Secretary's decision regarding an entire country's TPS designation. It is never applied to an individual noncitizen, and individual proceedings against that noncitizen would be an inapt forum to raise a challenge to the Secretary's broader TPS decision.

In any event, the Court need not decide whether 8 U.S.C. § 1252(f)(1) applies to the TPS statute. Even assuming that it applies, the Court concludes that it does not limit declaratory relief. Several courts of appeals have reached the same conclusion. *See, e.g.*, *Onosamba-Ohindo v. Ball*, No. 23-6804, 2026 WL 2176738, at *5–6 (2d Cir. July 29, 2026) (citing decisions from the First, Third, Ninth, and D.C. Circuits). *But see Hamama v. Adducci*, 912 F.3d 869, 880 n.8 (6th Cir. 2018). And although the Supreme Court has not squarely decided the issue, several Justices have suggested that section 1252(f)(1) does not apply to declaratory relief. *See Preap*, 586 U.S. at 402–03 (Alito, J., joined by Roberts, C.J., and Kavanaugh, J.); *Aleman Gonzalez*, 596 U.S. at 571–72, 572 n.9 (Sotomayor, J., concurring).

The Court also concludes—in accordance with the other lower courts to decide the issue, including the Fifth, Ninth, and D.C. Circuits—that section 1252(f)(1) does not preclude vacatur or postponement under the APA. *See, e.g.*, *Texas v. United States*, 126 F.4th 392, 419 (5th Cir. 2025); *Nat'l TPS All. v. Noem*, 166 F.4th 739, 758–61 (9th Cir. 2026); *Make the Road N.Y. v. Noem* (*Make the Road III*), No. 25-5320, 2025 WL 3563313, at *15–18 (D.C. Cir. Nov. 22, 2025); *Make the Road N.Y. v. Mullin* (*Make the Road IV*), 179 F.4th 16, 30–33 (D.C. Cir. 2026). For both issues, the cited decisions

provide thorough analyses of both sides of the argument. Rather than exhaustively retread the same ground, this Court will simply underscore the main points underlying its decision.

By its terms, section 1252(f)(1) only limits courts' authority to "enjoin or restrain" the government's implementation of the immigration laws. The Supreme Court has interpreted "enjoin" to refer to an "'injunction,' which is a judicial order that 'tells someone what to do or not to do.'" *Aleman Gonzalez*, 596 U.S. at 548–59 (quoting *Nken v. Holder*, 556 U.S. 418, 428 (2009)). A declaratory judgment is not an injunction. *Brito v. Garland*, 22 F.4th 240, 251 (1st Cir. 2021). Neither are vacatur and its temporary form—postponement. *Nat'l TPS All.*, 166 F.4th at 759–61; *Make the Road IV*, 179 F.4th at 32.

The difference is not just in the label. "'[T]he extraordinary remedy of injunction,' . . . directs the conduct of a party, and does so with the backing of its full coercive powers." *Nken*, 556 U.S. at 428. In contrast, a declaratory judgment is a "much milder form of relief than an injunction" that may be persuasive but is "not ultimately coercive" and does not carry the threat of contempt for noncompliance. *Steffel v. Thompson*, 415 U.S. 452, 471 (1974); *see Brito*, 22 F.4th at 251. Likewise, vacatur and postponement operate directly on the agency action at issue rather than "direct[ing] individuals to act or not to act." *Make the Road III*, 2025 WL 3563313, at *16. And importantly, apart from invalidating the agency action, they "neither compel[] nor restrain[] further agency decision-making." *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022).

That leaves the question of whether Congress intended to limit declaratory relief or vacatur / postponement through the word "restrain." In interpreting section



AUNGDOE000007

1252(f)(1), the Supreme Court has said that "to restrain" means "to 'check, hold back, or prevent (a person or thing) from some course of action.'" *Aleman Gonzalez*, 596 U.S. at 549 (quoting 5 Oxford English Dictionary 756 (2d ed. 1989)). But the Court also noted that the scope of "restrain" might depend on context: it "sometimes has a 'broad meaning' that refers to judicial orders that 'inhibit' particular actions, and at other times it has a 'narrower meaning' that includes 'orders that stop (or perhaps compel)' such acts." *Id.*

In section 1252(f)(1), there are good reasons to think that "restrain" does not refer to declaratory judgments, vacatur, or postponement. As an initial matter, it is not clear that "restrain" must be interpreted to have independent meaning from "enjoin," as the government urges. As the D.C. Circuit has noted, "the phrase 'enjoin or restrain' is a familiar legal doublet" that can easily be read as "a conventional pairing of terms for emphasis and breadth, not an invitation to parse each word for independent meaning." *Make the Road IV*, 179 F.4th at 32 n.15. And one obvious reason to include the word "restrain" would be to encompass temporary restraining orders. *Id.* The Federal Rules of Civil Procedure use the phrase "enjoined or restrained" for this very reason. Fed. R. Civ. P. 65(c). The heading of section 1252(f)(1), "Limit on injunctive relief," further supports reading "enjoin and restrain" this way.

The government counters that "restrain" must have independent meaning because Congress omitted the word in subsection (f)(2). That subsection, titled "Particular cases," says, "Notwithstanding any other provision of law, no court shall enjoin the removal of any alien pursuant to a final order under this section unless the alien shows by clear and convincing evidence that the entry or execution of such order

is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). The government's argument raises the question of why Congress would establish a "clear and convincing evidence" standard for injunctive relief but not for a declaratory judgment, vacatur, postponement, or whatever other relief is captured by "restrain." That reading seems more unusual than accepting that "enjoin or restrain" is a legal doublet rather than two words with independent meanings. Additionally, the D.C. Circuit has offered one explanation for the difference in language, though not one that helps the government: perhaps "restrain" captures forms of coercive relief (not declaratory judgments, vacatur, or postponement) that "enjoin" might not—such as mandamus, which compels official action and thereby places restraints on the operation of the immigration laws. *Make the Road IV*, 179 F.4th at 32 n.15.

Moreover, comparing subsection (f)(1) to other statutory language cuts more decisively against the government. 8 U.S.C. § 1252(e)(1)—a neighboring provision to subsection (f)(1), in the same section, added at the same time in IIRIRA—says:

> Without regard to the nature of the action or claim and without regard to the identity of the party or parties bringing the action, no court may . . . enter *declaratory*, injunctive, or *other equitable relief* in any action pertaining to an order to exclude an alien in accordance with section 1225(b)(1) of this title except as specifically authorized in a subsequent paragraph of this subsection.

8 U.S.C. § 1252(e)(1)(A) (emphasis added). The fact that Congress expressly precluded declaratory relief and included a catchall for other equitable relief in subsection (e)(1) but omitted similar language in subsection (f)(1) bolsters the reading that subsection (f)(1) is confined to injunctive relief. *See Brito*, 22 F.4th at 251.

Similarly, the Hobbs Administrative Orders Review Act, which generally governs judicial review of final orders of removal, states that courts of appeal have exclusive



AUNGDOE000009

jurisdiction to "make and enter . . . a judgment determining the validity of, and enjoining, setting aside, or suspending" an agency order. 28 U.S.C. § 2349(a). Again, the fact that Congress uses language specific to declaratory judgments, vacatur, and postponement / stays here but not in section 1252(f)(1) supports the reading that the latter does not extend to those forms of relief. The Hobbs Act also uses the word "restrain" as distinct from "suspending" or "setting aside." *Id.* § 2349(b); *cf. Make the Road III*, 2025 WL 3563313, at *18 (pointing out that equating "restrain," "suspend," and "stay" in the Hobbs Act creates a surplusage problem). That further cautions against equating "restrain" in section 1252(f)(1) with postponement or vacatur. And looking to statutes outside of the immigration context adds additional confirmation that Congress knows how to clearly preclude APA remedies but did not do so in section 1252(f)(1). *See Immigr. Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (citing 16 U.S.C. § 1855(f)(1)(A); 42 U.S.C. § 7607(d)(1)).

Reading subsection (f)(1) to limit declaratory relief, postponement, and vacatur also creates conflict with subsection (e)(3) of the same section. Subsection (e)(3) is titled "Challenges on validity of the system" and expressly authorizes judicial review of challenges to 8 U.S.C. § 1225(b) "and its implementation" for "whether such section, or any regulation issued to implement such section, is constitutional," as well as "whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued . . . to implement such section, is . . . in violation of law." 8 U.S.C. § 1252(e)(3)(A). Importantly, such challenges "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure . . . is first implemented." *Id.* § 1252(e)(3)(B). That is in tension with subsection (f)(1)'s channeling

regime. It makes little sense to authorize broad challenges to the validity of a statute, regulations, and policies but then channel them and limit the scope of relief to individual proceedings. *See Make the Road III*, 2025 WL 3563313, at *17. Indeed, subsection (f)(1)'s channeling, in conjunction with subsection (e)(3)(B)'s 60-day deadline, presents the risk of nullifying the review provided by subsection (e)(3) if, for example, an agency implements a policy but waits sixty days before applying it to any individual noncitizen.

Perhaps "first implemented" in subsection (e)(3) can be interpreted to mean when the challenged policy is first applied to an individual noncitizen. *See id.* at *39 (Rao, J., dissenting). That would avoid completely nullifying review under subsection (e)(3), but even then subsection (f)(1) would let the government pin the legality of its policy to a single case involving a plaintiff of the government's choosing. Reading subsection (f)(1) as limited to injunctive relief resolves this tension and harmonizes the provisions. It would permit review under subsection (e)(3) outside of individual proceedings for purposes of awarding a declaratory judgment, postponement, or vacatur—natural remedies for the kind of systemic challenges that subsection (e)(3) authorizes.

Finally, reading subsection (f)(1) as limited to injunctive relief makes sense of the parenthetical exempting the Supreme Court. That parenthetical is apparently a unique one, and the Supreme Court has not said how it would work in practice. *See Biden*, 597 U.S. at 838–39 (Barrett. J., dissenting). But one possibility is this: a lower court could grant vacatur, postponement, or class-wide declaratory relief; the issue would go up on appeal; and if, for example, the Supreme Court held that the lower court correctly decided that the agency action was unlawful, it could issue appropriate injunctive relief.



AUNGDOE000011

*See Aleman Gonzalez*, 596 U.S. at 572 n.9 (Sotomayor, J., concurring). If, on the other hand, subsection (f)(1) withdraws all of those remedies from the lower courts, then it is much less clear how the Supreme Court would have the opportunity to exercise the power reserved to it. *Id.*

In sum, the Court concludes that 8 U.S.C. § 1252(f)(1) does not bar the plaintiffs' claims.

**B. Merits**

Section 705 of the APA authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending . . . review." 5 U.S.C. § 705. The standard for a postponement order under section 705 is the same as that for a preliminary injunction. *Cook County v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020). That standard requires the plaintiffs to show: (1) a likelihood of success on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a case against the government, like this one, the third and fourth factors merge. *Nken*, 556 U.S. at 435.

The plaintiffs' motion to postpone is based solely on their *ultra vires* and due process challenges. The Court addresses each in turn.

**1. Ultra vires**

The plaintiffs assert that the Secretary's decision was *ultra vires* because the Attorney General, not the DHS Secretary, has the authority to terminate a TPS designation. That theory is rooted in the fact that the provision concerning TPS



AUNGDOE000012

terminations, 8 U.S.C. § 1254a(b)(3)(B), refers to the Attorney General rather than the Secretary. The government responds that this is a nonconstitutional claim that is unreviewable under the TPS statute's jurisdictional bar, 8 U.S.C. § 1254a(b)(5)(A), as interpreted by the Supreme Court's decision in *Mullin*. On the merits, the government contends that the Homeland Security Act of 2002 (HSA), specifically its amendments to 8 U.S.C. § 1103(a), transferred TPS authority from the Attorney General to the DHS Secretary. The government further points out that courts and the executive branch have consistently adhered to that view for over two decades, without any intervention by Congress.

Starting with jurisdiction, the Court does not agree that the plaintiffs' *ultra vires* claim is unreviewable. The TPS jurisdictional bar states that "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." *Id.* § 1254a(b)(5)(A). The government seizes on the fact that an *ultra vires* claim is nonconstitutional, and the Supreme Court in *Mullin* expressly held that "the TPS statute's judicial-review bar applies to all non-constitutional claims." *Mullin v. Doe*, 146 S. Ct. at 2137.

The government overreads that statement. No party in *Mullin* raised the issue of who has TPS authority in the first place under the statute. In stating that the jurisdictional bar applied to all nonconstitutional claims, the Supreme Court assumed the undisputed premise that the jurisdictional bar, whatever its scope, applied to the Secretary's determinations. If the plaintiffs' reading is correct, then the jurisdictional bar applies only to "determination[s] of the Attorney General," not to determinations by the

Secretary, and does not preclude their claims in this case. Of course, if the plaintiffs' reading is wrong, then the jurisdictional bar does apply. The jurisdictional issue is intertwined with the merits of the statutory interpretation issue, and the default rule in situations of intertwinement is to proceed to the merits. *See Bell v. Hood*, 327 U.S. 678, 682 (1946); *Land v. Dollar*, 330 U.S. 731, 739 (1947); *Perttu v. Richards*, 605 U.S. 460, 472–74 (2025); *cf. Brownback v. King*, 592 U.S. 209, 217–19 (2021) (stating that because "a federal court always has jurisdiction to determine its own jurisdiction," in cases of intertwinement, a court may issue a decision that is simultaneously a ruling that it lacks jurisdiction and a judgment on the merits).

On the merits, the Court agrees with the government that the HSA, and subsequent amendments in 2003, transferred TPS authority to the Secretary. Congress enacted 8 U.S.C. § 1103 in the original INA under the title "Powers and Duties of the Attorney General and the Commissioner." INA § 103. It stated, in relevant part, that:

> The Attorney General shall be charged with the administration and enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens, except insofar as [the INA] or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . .

*Id.* Congress enacted the TPS statute in 1990 amendments to the INA. In accordance with the INA's designation of the Attorney General as the primary administrator of the immigration laws, the TPS statute's provisions referred to the Attorney General. *See* Immigration Act of 1990, Pub. L. No. 101-649, sec. 302, 104 Stat. 4978, 5030–36.

The HSA and follow-up amendments in 2003 made several relevant changes to 8 U.S.C. § 1103. First, they changed the title of 8 U.S.C. § 1103 to "Powers and Duties of the Secretary, the Under Secretary, and the Attorney General." HSA, Pub. L. No. 107-

296, sec. 1102(1), 116 Stat. 2135, 2273. Second, they substituted "Secretary of Homeland Security" for "Attorney General" in both the title and text of (a)(1). Homeland Security Act Amendments of 2003, Pub. L. No. 108-7, div. L, sec. 105, 117 Stat. 526, 531. Third, the HSA added "Attorney General" to the "except" clause. HSA sec. 1102(2). Because of these changes, 8 U.S.C. § 1103(a)(1) now reads: "The *Secretary of Homeland Security* shall be charged with the administration and enforcement of . . . laws relating to the immigration and naturalization of aliens, except insofar as . . . such laws relate to the powers, functions, and duties conferred upon the President, *Attorney General*, [etc.]" 8 U.S.C. § 1103(a)(1) (emphasis added). Fourth, the HSA codified the existence of the Executive Office for Immigration Review (EOIR) as an agency under the Attorney General and added subsection (g) to section 1103. HSA sec. 1102(2). That subsection is titled "Attorney General" and states that "[t]he Attorney General shall have such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were [previously] exercised by the [EOIR] . . . ." *Id.*; 8 U.S.C. § 1103(g)(1).

These changes established the Secretary of Homeland Security as the primary administrator of the immigration laws, which include the TPS statute. The plaintiffs challenge this interpretation by pointing out that section 1103(a)'s "except" clause carves out from the Secretary's authority the "powers, functions, and duties conferred upon . . . the Attorney General." They assert that some of those reserved powers are in the rest of section 1103, which enumerates some powers that the text assigns to the Attorney General. *See, e.g.*, 8 U.S.C. § 1103(a)(8). Likewise, because the TPS statute continues to refer to the Attorney General, the plaintiffs contend that TPS decisions

belong to the Attorney General rather than the Secretary.

One problem with this reading is that it draws implausible lines between the powers of the Attorney General and those of the Secretary. The plaintiffs' reliance on section 1103's enumerated powers illustrates the point. Paragraph (a)(2) says, "He shall have control, direction, and supervision of all employees and of all the files and records of the Service." *Id.* § 1103(a)(2). On the plaintiffs' reading, "he" refers to the Secretary. Paragraphs three through seven likewise would refer to the Secretary. Paragraphs eight, ten, and eleven, on the other hand, expressly refer to the Attorney General. The plaintiffs read this difference in language as a deliberate allocation of authority between the Secretary and the Attorney General, but it was already in the original INA, when both "he" and "Attorney General" referred to the same person. *Compare id.* § 1103, *with* INA, § 103(a). It is therefore unlikely that the express references to the Attorney General reflect a congressional intent to carve out that power from the Secretary's overarching authority over the immigration laws.

That conclusion is reinforced by a broader picture of the HSA. Congress did not go through the INA and change specific references to the Attorney General to instead refer to the Secretary. Instead, it broadly reassigned functions and added a provision that "deem[s]" references to other officers to refer to the Secretary. 6 U.S.C. § 557. As a result, the INA is replete with references to the Attorney General that, under the plaintiffs' reading, were never transferred to the Secretary. The TPS statute is one example. Given the statutory history, the Court declines to read those residual references to the Attorney General to significantly undermine the Secretary's role as primary administrator of the immigration laws under section 1103(a)(1).



AUNGDOE000016

Another problem with the plaintiffs' reading is that it renders section 1103(g) superfluous. They seem to suggest that section 1103(a)(1) merely preserves the Attorney General's preexisting authority unless there is a separate express transfer of power. That reading finds some support in other parts of the HSA that expressly transfer certain immigration functions to DHS officials. *See, e.g.*, HSA secs. 441, 451(b). But under that interpretation, section 1103(a)(1) would already preserve the Attorney General's preexisting authority over EOIR, and there would be little reason for Congress to enact 1103(g). The better reading is that section 1103(a) effected a general transfer of immigration authority to the Secretary; section 1103(g), enacted at the same time, clarified that the Attorney General would reserve authority previously exercised by EOIR; and the carve out in section 1103(a)(1) of the "powers, functions, and duties conferred upon . . . the Attorney General" refers primarily to that reservation.

Longstanding practice confirms that TPS authority lies with the Secretary. The government asserts that since Congress enacted the HSA, every court has interpreted the statute as transferring authority to the Secretary. That includes the Supreme Court. *See, e.g.*, *Mullin v. Doe*, 146 S. Ct. at 2129; *Preap*, 586 U.S. at 397 & n.2. Likewise, the government points out that the DHS Secretary has exercised TPS authority since Congress enacted the HSA. The plaintiffs do not dispute this practice, but they say that no decision has squarely addressed their argument and that courts are not bound by executive interpretations of statutes. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). Even so, it is unlikely that everybody has misinterpreted the allocation of immigration authority in the HSA for the past two decades and that Congress has simply let it slide.

Finally, even if the plaintiffs' reading of the statute were correct, it would defeat their own claim to relief. The portion of the TPS statute authorizing designations, like the portion addressing termination, refers to the Attorney General. The plaintiffs' reading would therefore mean that the Secretary lacked authority to designate Burma for TPS in the first place. The plaintiffs offer a few arguments for why their contention is not self-defeating, but none work.

First, they assert that the statute only authorizes TPS termination based on country assessment. But there is a distinction between terminating TPS and there never being a valid TPS designation in the first place. Second, they contend that they only challenge the TPS termination decision, and they say that a challenge to the initial designation would have to be raised in a separate lawsuit. Putting aside the fact that this argument does not get the plaintiffs far as a practical matter, the Court does not see a reason why a challenge to the initial designation would have to be raised separately. The plaintiffs do not provide any authority for that rigid view, nor is the Court aware of any.

Third, the plaintiffs argue that reliance interests require the government to consider alternatives to terminating Burma's TPS designation. They rely on the Supreme Court's decision in *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), but that case addressed a different question. The Court in *Regents* held that the Secretary's decision to rescind the Deferred Action for Childhood Arrivals program on the basis that it was unlawful was arbitrary and capricious in part because he had failed to consider whether there were legitimate reliance interests. *Id.* at 30–33. The need to consider reliance interests is a constraint

on agency decisionmaking imposed by the APA. It does not follow from that principle that a court may uphold *ultra vires* agency action solely because of reliance interests.

The Court therefore dismisses the plaintiffs' *ultra vires* claim. And because the Court has concluded that the TPS statute and its jurisdictional bar apply to the Secretary's decision, *Mullin v. Doe* controls and requires dismissal of the plaintiffs' other nonconstitutional (*i.e.*, APA) claims.

**2. Due process**

The plaintiffs' other basis for preliminary relief is their procedural due process claim. That claim "consists of two elements: (i) deprivation by [government] action of a protected interest in life, liberty, or property, and (ii) inadequate . . . process." *Reed v. Goertz*, 598 U.S. 230, 236 (2023). To establish the first element, the plaintiffs argue that the TPS statute provides them with a "legitimate claim of entitlement" to TPS status and the benefits that come with it. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). On the second element, the plaintiffs contend that the Secretary's alleged failure to consult appropriate agencies, review country conditions, and publish the "actual 'basis for the determination'"—as required by the statute—meant that the Secretary's process was inadequate. *See* Pls'. Renewed Mem. in Supp. of Mot. to Postpone at 20.

The government responds that the plaintiffs' claim is a relabeled statutory argument that is precluded by the TPS statute's jurisdictional bar. On the merits, the government argues that: the plaintiffs lack a legitimate claim of entitlement because the statute does not impose substantive constraints on the Secretary's determination on whether country conditions continue to be met; the decision to terminate TPS is a

legislative decision that satisfied due process; and the plaintiffs received all the process that they were due because the Secretary was not required by the Constitution to follow the statutory process and that in any event she did so.

The Court again disagrees with the government on the jurisdictional issue but agrees that the due process claim falls short on the merits. Starting with jurisdiction, the Supreme Court in *Mullin* assumed—based on the government's concession—that constitutional claims would still be reviewable under the TPS statute's jurisdictional bar, and this Court sees no reason to depart from that assumption. *See Mullin v. Doe*, 146 S. Ct. at 2137. It is true that the plaintiffs' due process claim relies exclusively on statutory violations. But if the plaintiffs are right that the statutory procedures are required by due process—a floor set by federal constitutional law—the claims are distinct. *See Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1442 (7th Cir. 1996) (en banc). *Compare id.* at 1448 (Easterbrook, J., concurring) (emphasizing the need to distinguish "systematic and personal challenges" to avoid "dress[ing] ordinary legal arguments in constitutional garb"), *with* Am. Compl. ¶¶ 89–122 (alleging pattern of similar TPS terminations).

Turning to the merits, the Court need not resolve the parties' disputes over whether the plaintiffs have a protected interest or whether TPS terminations are legislative or adjudicative. Even assuming that the plaintiffs prevail on those points, their alleged procedural defects do not state a due process violation. The core of due process is notice and an opportunity to be heard. *See, e.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). The plaintiffs do not claim that they were entitled to hearings before the Secretary's decision to terminate TPS. And the decision was

published in the federal register, providing notice. The plaintiffs argue that the rationale in the federal register was not the *actual* basis for the decision, but that amounts to a challenge to the merits of the decision or APA review—both barred after *Mullin*—not a due process claim. So too with the alleged failure to (adequately) assess country conditions.

The remaining procedural defect, the failure to consult with appropriate agencies, is a statutory requirement, not one imposed by the Constitution. The plaintiffs have not pointed to any case imposing a similar requirement under the name of due process, nor can the Court find any. And if appropriate consultation is a due process requirement, then it presumably would apply to all sorts of government decisionmaking. The Court sees no basis for imposing that kind of internal government consultation.

The plaintiffs argue that due process in the immigration context is equivalent to statutory process, citing two Supreme Court decisions, *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), and *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950). Both cases, however, establish that whatever processes Congress provides for the lawful admission of noncitizens into the United States automatically satisfy due process. It does not follow that a failure to follow statutorily prescribed procedures also always *violates* due process. In other words, compliance with statutory procedures in this context is sufficient but not always necessary for due process.

The Court therefore dismisses the plaintiffs' due process claim and denies their motion to postpone.

### 3. Equal protection

The final claim remaining is the plaintiffs' equal protection claim, which the government has moved to dismiss. On a motion to dismiss, the question is whether the plaintiffs' complaint alleges sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiffs present two theories for their equal protection claim: (1) the TPS determination was racially discriminatory, and (2) the TPS termination reflects a "bare animus" against TPS holders as a politically unpopular group.

The first theory is substantially similar to the claim the Supreme Court held was unlikely to succeed in *Mullin v. Doe*, 146 S. Ct. at 2138–40. There, the plaintiffs relied on a pattern of allegedly preordained TPS terminations in combination with statements by the President and the Secretary that, in their view, reflected racial discrimination against non-white people. *Id.* Those statements included some from the President that "express strong objections to [recent] immigration," express "great displeasure with TPS," "broadly denigrate the countries for which TPS designations have been granted," and "malign Haitians who have come to the United States"—as well as statements by former Secretary Noem that "express[] antipathy toward travelers from countries covered by a renewed travel ban," made "derogatory comments about immigration and its effects," and "promised changes and criticized past implementation of TPS." *Id.*; *see id.* at 2149–50 (Kagan, J., dissenting) (quoting statements).

The majority concluded that this evidence was not enough. In its view, "[n]one of the cited statements [were] overtly racial, and in substance all expressed policy views that could rest on race-neutral justifications." *Mullin v. Doe*, 146 S. Ct. at 2138.



AUNGDOE000022

"[W]hatever one may think of the cited statements," the Court said, "they are insufficient to show that the termination of Haiti's TPS designation was based on the race of the Haitian people." *Id.* at 2139. Additionally, the Court continued, there was a "strong, race-neutral explanation of these officials' statements: the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Id.* In a footnote, the Court acknowledged that the plaintiffs had presented additional, newly discovered evidence, but it dismissed that evidence as cumulative. *Id.* at 2140 n.7. The Court therefore concluded that the Haiti plaintiffs were "not entitled to interim relief on their equal protection claim." *Id.* at 2140.

The plaintiffs here rely upon much of the same evidence for their race-discrimination claim. Some of the Haiti-specific statements in *Mullin* do not apply equally to Burma, but the plaintiffs' theory is less about discrimination against Burma in particular, and more about racial discrimination as between white and non-white people. Several of the statements that could be read as country-specific nonetheless fit the plaintiffs' broader theory of race discrimination against non-white people. *See, e.g.*, *id.* at 2149 (Kagan, J., dissenting) (quoting the President's statement that Haitians and other immigrants are "poisoning the blood" of our country).

This Court has previously concluded, as the Supreme Court assumed in *Mullin*, that *Arlington Heights* supplies the relevant framework. *See Doe v. Mullin*, No. 25 C 15483, 2026 WL 1983721, at *6 (N.D. Ill. July 9, 2026) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977)). And as the Court previously noted, the Supreme Court's decision in *Mullin* was decided under a likelihood of success standard based on only public statements. *Id.* The Supreme Court did not

decide that the plaintiffs had failed to state a plausible claim for relief. It is hard to say that the statements here are not enough to get past the motion to dismiss stage and provide the plaintiffs with at least an opportunity to prove their case through discovery. *Arlington Heights* calls for a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266. And based on the public statements here, it seems plausible that the plaintiffs could uncover evidence that might have changed the outcome in *Mullin*. *Cf. Cook County v. Wolf*, 461 F. Supp. 3d 779, 794 (N.D. Ill. 2020) ("Most people know by now that the quiet part should not be said out loud."); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982) ("[O]fficials acting in their official capacities seldom, if ever, announce on the record that they are pursuing a particular course of action because of their desire to discriminate against a racial minority.").

On the other hand, the Supreme Court's reasoning in *Mullin* suggests that it might not be so limited by its procedural posture. In determining that the plaintiffs were unlikely to succeed at showing that discriminatory purpose was a motivating factor in the Secretary's decision, *Mullin* emphasized that the evidence provided a "strong, race-neutral explanation" for the TPS terminations and public statements: "the present administration's general stance on immigration and its obvious antipathy toward past administrations' TPS policies." *Mullin v. Doe*, 146 S. Ct. at 2138–39. Following the reasoning in *Mullin*, the same could be said of the allegations here. *Cf. Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotations omitted)). If that is enough to defeat the race-discrimination

claim, then it is hard to see what evidence, short of an outright admission that racial animus motivated the decision to terminate TPS, would help the plaintiffs.

The Court does not view *Mullin*, decided under a different standard, as controlling the motion to dismiss at issue here. The Court therefore denies the government's motion to dismiss the race-discrimination claim. But because there is substantial ground for difference of opinion on the scope of *Mullin*, and because resolution of this controlling question of law may materially advance the ultimate termination of this litigation, the Court certifies this ruling for interlocutory appeal under 28 U.S.C. § 1292(b).

Finally, the Court addresses the plaintiffs' alternative theory that the TPS termination violates equal protection because it is based on a bare animus against TPS holders. This theory is based on the principle that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. 620, 635 (1996). But there is a distinction between bare desire to harm TPS holders and animus against TPS policy (and immigration as a whole). The Supreme Court's reasoning in *Mullin* points to the latter, not the former.

The Court therefore grants the government's motion to dismiss the plaintiffs' bare animus equal protection claim.

**Conclusion**

In conclusion, the Court denies the plaintiffs' motion to postpone [dkt. 98]; grants the government's motion to dismiss [dkt. 109] as to the plaintiffs' APA, *ultra vires*, due process, and bare animus equal protection claims; denies the motion to dismiss as to the plaintiffs' race-discrimination equal protection claim; and certifies that denial for

interlocutory appeal under 28 U.S.C. § 1292(b). The Court also denies as moot the government's motion to stay discovery pending resolution of these motions [dkt. 108].

Date: August 7, 2026

MATTHEW F. KENNELLY
United States District Judge



AUNGDOE000026